**COLUMBIA MUTUAL INSURANCE COMPANY, Appellant– Respondent,**

v.

**Curtis W. LONG, M.D., and Ann H. Long, Respondent–Appellant.**

**Nos. WD 67571, WD 67572.**

Missouri Court of Appeals,
Western District.

June 10, 2008.

Application for Transfer to Supreme Court
Denied July 29, 2008.

Paul D. Cowing, Lee's Summit, MO, for appellant.

Stephen K. Nordyke, Butler, MO, for respondent.

RONALD R. HOLLIGER, Judge.

Columbia Mutual Insurance Company ("Columbia") appeals a judgment, entered following jury verdict, in favor of their insureds, Curtis and Ann Long ("the Longs" or, individually, "Dr. Long" and "Mrs. Long"). That verdict awarded damages for breach of contract and vexatious refusal to pay under a contract of insurance covering cattle owned by the Longs. Columbia filed post-trial motions for new trial and to reduce the award in accordance with a co-insurance provision. The Longs filed a cross-motion to increase the award to include prejudgment interest. The trial court denied all motions and entered judgment consistent with the jury's verdict. On appeal, Columbia challenges various trial court actions flowing from a finding that the underlying insurance policy's theft coverage exclusions are ambiguous. Columbia also challenges a jury instruction regarding the Longs' burden of proof, the sufficiency of the evidence, and the denial of its post-trial motion. The Longs have filed a cross appeal, challenging the trial court's denial of their post-trial motion. We affirm the judgment of the trial court, except to the extent that prejudgment interest was denied.

## Factual and Procedural Background

The Longs own a cattle operation in Southwest Missouri. In the fall of 2001, employees of the Longs became suspicious of the activities of Scott Simms ("Simms"), who worked as a farm manager for the Longs. One of those employees testified at trial that Simms had been loading cattle for transport at odd times and that some cattle that should have been on the farm could not be located. These suspicions were reported to Dr. Long, who then conducted an investigation.

Dr. Long's investigation confirmed that cattle seemed to be missing, and he con-

fronted Simms, who denied any wrongdoing. Dr. Long also contacted the local sheriff's office, which also initiated an investigation. Mrs. Long reported the apparent theft to Charles Rush, of the Cook Insurance Agency, who then forwarded the information to Columbia.

A Columbia adjuster called Dr. Long, spoke with him about the loss, and sent a letter denying coverage on the basis that the loss fell within an exclusion for thefts disclosed on taking inventory. A tape recording of that conversation was admitted at trial. Two months later, another adjuster called and subsequently visited with the Longs to discuss their loss. Several weeks after that visit, the Longs received a second letter denying their claim.

Columbia initiated this suit as a declaratory judgment action, seeking a determination of the parties' rights under the insurance policy. The Longs filed counterclaims for breach of contract and for vexatious refusal to pay, based upon that same policy. Columbia dismissed its declaratory judgment action and the Longs' claims proceeded to a jury trial at which damages were assessed against Columbia on both counts. Columbia filed a post-trial motion for a new trial and to reduce the verdict in accordance with a co-insurance clause, and the Longs filed a similar motion to increase the judgment to include the award of prejudgment interest. All motions were denied and both parties have appealed.

### Discussion

The insurance contract at issue in this case provides coverage for theft, but excludes losses incurred "by wrongful conversion or embezzlement," as well as losses resulting from "unauthorized instructions to transfer property to any person or to any place." On appeal, Columbia does not dispute the jury's finding that the Longs' loss of cattle was the result of theft, which term the policy defines as "any act of stealing or attempt to steal." Instead, Columbia claims that the loss at issue falls within one of the above-quoted exclusions.

■ Columbia's first point on appeal asserts error in the trial court's finding that the policy's exclusionary language is ambiguous. The potential ambiguity of that language was first raised by the Longs, prior to trial, in a motion in limine. It was raised again when the Longs objected to Columbia's reference to these terms in opening statement, as well as each time the Longs objected to the admission of evidence relating to these exclusions, and when the Longs objected to similar references during Columbia's closing argument. The ambiguity or lack thereof in these terms was also at issue in each of Columbia's motions for a directed verdict, in its proffered jury instructions, and in its motions for judgment notwithstanding the verdict and for a new trial.

The trial court's actions, each time this issue was raised, were consistent with the theory that the policy language was relevant, and evidence thereof was admissible on the issue of vexatious refusal, but not on the issue of policy coverage. Columbia's first point on appeal does not identify which of the many trial court actions relying upon a finding of ambiguity produced reversible error.

■ As appellate courts are fundamentally courts of error, a point relied on that does not identify specific error preserves nothing for appellate review. For this reason, Rule 84.04 [1] requires all appellants to "identify the trial court ruling or action that the appellant challenges." Rule 84.04(d)(1)(A). Columbia's first point on

---

1. All rules cited are Missouri Court Rules (2007).

appeal fails to comply with this rule. Standing alone, that point preserves nothing for this court to review. In the argument section following Columbia's first point, however, reference is made to two specific trial court actions, which we review ex gratia.

■ The first of those actions is the trial court's grant of a pre-trial motion in limine, ordering that the parties not refer to the disputed language. The grant of a motion in limine is an interlocutory order, and therefore not a potential source of reversible error. *See, e.g., State v. Purlee,* 839 S.W.2d 584, 592 (Mo. banc 1992). The rationale of this rule is amply demonstrated by the subsequent progress of the trial in this case. Despite initially granting the Long's motion, the trial court ultimately allowed the admission of evidence concerning the policy exclusions at trial. Columbia cannot now claim any prejudice flowing from the interlocutory grant of a motion to exclude that evidence.

■ The second trial court action complained of in Columbia's argument involved the exclusion of Mrs. Long's testimony concerning her understanding of the term "embezzlement." Her testimony in this regard was presented in the form of an offer of proof in which Mrs. Long testified that she believes embezzlement to be "like working at a bank and you take cash and try to falsify the records to cover it up." This testimony is generally consistent with dictionary definitions of the word "embezzlement," several of which were subsequently read into the record by Columbia in support of a motion for directed verdict.

One such dictionary defines embezzlement as: "to take (money, for example) for one's own use in violation of a trust." [2]

"The cardinal rule in the interpretation of a contract is to determine the intention of the parties and to give effect to that intention." *Fulton v. Cent. Elec. Power Co-op.,* 810 S.W.2d 349, 351 (Mo.App. W.D.1991). However, in the absence of any ambiguity, that intent is to be discerned from the words used in the contract. *Id.* Given Columbia's argument that the word "embezzlement" is unambiguous, it is difficult to discern what purpose Columbia has in eliciting testimony concerning Mrs. Long's personal understanding of the meaning of that word. Even assuming that this testimony is relevant (a questionable proposition, given Columbia's argument that the word "embezzlement" is unambiguous), it is difficult to see what benefit Columbia seeks by eliciting this testimony. The Longs do not claim that Simms stole money; they filed a claim under the policy for the loss of cattle. [3]

We find no error in the trial court's exclusion of this testimony.

■ Columbia's second appellate point asserts instructional error. At the close of all the evidence, the jury was instructed to find in favor of the Longs if it believed, among other things, that "cattle belonging to plaintiffs were stolen." This instruction was based upon MAI 31.09. Columbia objected to this instruction, and proffered an instruction that would have required the jury to instead find that the Longs' "property was damaged by theft," and which included an affirmative defense tail. [4] The affirmative defense instruction

2. In argument before the trial court, Columbia identified this definition as coming from the Second College Edition of the American Heritage Dictionary.

3. We do not hold that property, including cattle, cannot be embezzled. We merely point out that Mrs. Long's testimony to that effect could not have benefitted Columbia, given the facts of this case.

4. Columbia also proffered an alternative instruction that would have incorporated the terms of the policy exclusion into the findings

reference in that tail was a modification of MAI 32.24 and would have required a defense verdict if the jury believed, "theft occurred by wrongful conversion, or theft occurred by embezzlement, or theft occurred due to unauthorized instructions to transfer property to any person or to any place." Each of these three alternatives was submitted disjunctively as a separate affirmative defense. Each of these alternatives must, therefore, be supported by the evidence and in proper form. *Marion v. Marcus*, 199 S.W.3d 887, 894 (Mo.App. W.D.2006).

▄▄▄ "The test of correctness of an instruction is how the instruction will naturally be understood by the average juror. Jurors should be credited with ordinary intelligence, common sense, and an average understanding of the English language." *Id.* at 895 (internal quotes, cites, and alterations omitted). As tendered, Columbia's proposed instruction set out three separate exclusions. Because the first of those exclusions (i.e. "wrongful conversion") is dispositive on appeal, we address only that portion of Columbia's proffered instruction. In relevant part, that instruction would have allowed the jury to find that the Longs' loss resulted from the theft of their cattle, but would then have required a defense verdict if that theft "occurred by wrongful conversion." Because this jury instruction draws no mean-

ingful distinction between the policy terms "theft" and "conversion," the coverage described by that instruction would have been illusory at best. *See Lutsky v. Blue Cross Hosp. Serv., Inc., of Mo.*, 695 S.W.2d 870, 874 (Mo. banc 1985). Or, as our Supreme Court has explained:

> If a contract promises something at one point and takes it away at another, there is an ambiguity. Such an ambiguity is patent, rather than latent, and may be resolved within the four corners rather than by means of extrinsic aids. Because the ambiguity is in an insurance contract it is to be resolved in favor of the insured and against the insurer.

*Id.* at 875 (footnotes omitted).

▄▄▄ The terms of an insurance contract are to be ascribed the meaning that "a reasonable layperson in the position of the insured would have thought they meant." *Niswonger v. Farm Bureau Town & Country Ins. Co. of Mo.*, 992 S.W.2d 308, 316 (Mo.App. E.D.1999). The word "conversion" is problematic in this context, as that term carries many different meanings and it is not clear that a reasonable layperson would ascribe to that word a sense that comes anywhere near its accepted legal meaning.[5] Fortunately, this court need not decide what meaning to ascribe to that word, since, even under the definition advanced by Columbia, the prof-

required for a plaintiff's verdict. Because a policy exclusion is properly viewed as an affirmative defense, *see Century Fire Sprinklers Inc. v. CNA/Transp. Ins. Co.*, 23 S.W.3d 874, 879 (Mo.App. W.D.2000), we here consider the propriety of Columbia's rejected affirmative defense instruction.

5. The word "conversion" is defined as:
 1.a. The act of converting. b. The state of being converted. 2. A change in which one adopts a new religion, faith, or belief. 3. Something that is changed from one use, function, or purpose to another. 4. *Law.* a. The unlawful appropriation of another's property. b. The changing of real property to personal property or vice versa. 5. The exchange of one type of security or currency for another. 6. *Logic.* The interchange of the subject and predicate of a proposition. 7. *Football.* A score made on a try for a point or points after a touchdown. 8. *Psychiat.* A defense mechanism in which repressed ideas, conflicts, or impulses are manifested by bodily symptoms that have no physical cause.
American Heritage College Dictionary 304 (3d Ed.1993).

fered instruction was not proper. In the context of this insurance policy, Columbia claims that the word "conversion" refers to a well-known common law tort. That tort is commonly defined as:

An unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another, to the alteration of their condition or the exclusion of the owner's rights. Any unauthorized act which deprives an owner of his property permanently or for an indefinite time. Unauthorized and wrongful exercise of dominion and control over another's personal property, to exclusion of or inconsistent with rights of [the] owner.

Black's Law Dictionary 332 (6th Ed.1990). Missouri cases establish that the tort of conversion is "the unauthorized assumption of the right of ownership over the personal property of another to the exclusion of the owner's rights." *Maples v. United Sav. & Loan Ass'n*, 686 S.W.2d 525, 527 (Mo.App. S.D.1985).[6]

"Theft" is defined by the policy in question to mean "any act of stealing or attempt to steal." "Steal," in turn, means "[t]o take the property of another without right or permission." American Heritage College Dictionary 1329 (3d Ed.1993). Given these overlapping meanings of the terms "conversion" and "theft," it is impossible that property might be lost by way of theft without a conversion taking place.

Or, to put it in the context of this case, it was impossible for Simms to "take the property of [the Longs] without right or permission" without also engaging in "the unauthorized assumption of the right of ownership over the personal property of another to the exclusion of the owner's rights."

Generally speaking, "theft" refers to a criminal act, and "conversion" is a civil cause of action. Nonetheless, the underlying facts supporting either a criminal prosecution or a civil suit are identical. Nothing in Columbia's offered instruction limited the meaning of the word "conversion" as used in that instruction in a way that would have made it possible for the Longs to have suffered a loss by way of theft without also suffering a loss by wrongful conversion. Similarly, nothing in the evidence presented at trial suggested any narrower meaning of the word "conversion" in the insurance contract. Given this state of affairs, the inclusion of the word "conversion" in Columbia's proffered instruction was confusing, at the least, and would have failed to properly instruct the jury.

Because key terms in that instruction were undefined, the jury could have found that the very facts that created coverage under the theft provision also triggered the conversion exclusion.[7] For this reason, that instruction would have misstated

6. Columbia cites to *O'Daniel v. NAU Country Insurance Co.*, 427 F.3d 1058 (8th Cir.2005), for support. In that case, the court said that the term "theft" may only sometimes include "conversion." Additionally, the circumstances were far different there where the insured transferred the cattle to a feedlot where some then came up missing. The court emphasized that the cattle were covered on the insured's premises and their possession had been transferred to an uncovered location without notice to the insurer. Likewise, in *Roth v. Farmers Mutual Insurance Co. of Nebraska*, 220 Neb. 612, 371 N.W.2d 289 (1985), the facts involved transfer of possession to an agister who failed to pay for the hogs or return them when requested by the owner.

7. Without any definition for the term "conversion," Columbia's proffered instruction would also have submitted to the jury an abstract legal question (whether Simms' acts constituted a "conversion"). Such an instruction creates what is commonly referred to as a "roving commission" and is not proper for that reason. *See Marion*, 199 S.W.3d at 895.

Missouri law, which has consistently held that "[a]n insurance policy being a contract designed to furnish protection will, if reasonably possible, be interpreted so as to accomplish that object and not to defeat it." *Brugioni v. Md. Cas. Co.*, 382 S.W.2d 707, 710 (Mo.1964). Contrary to that well established principle, Columbia's instruction would have rendered the policy's theft coverage, "utterly useless to an assured, and would be nothing short, practically speaking, of collecting a premium without rendering a consideration." *James v. U.S. Cas. Co.*, 113 Mo.App. 622, 88 S.W. 125, 127 (1905).

Columbia's proffered instruction was not in proper form, and there was no error in its rejection by the trial court. *See Marion*, 199 S.W.3d at 896.

■ Columbia's third point on appeal asserts instructional error regarding a plaintiff's burden of proof in a claim for vexatious refusal. Columbia asserts that such claims must be submitted under a "clear and convincing evidence" standard. Columbia cites no case holding that this is the proper burden of proof in a vexatious refusal case. Instead, Columbia argues that vexatious refusal damages are punitive in nature, and cites *Rodriguez v. Suzuki Motor Corp.*, 936 S.W.2d 104 (Mo. banc 1996), for the proposition that punitive damages must be proved by clear and convincing evidence. The actual holding of *Rodriguez* is succinctly stated in that opinion: "For common law punitive damage claims, the evidence must meet the clear and convincing standard of proof." *Id.* at 111. The holding in *Rodriguez* is explicitly limited to common law punitive damage claims. A claim for vexatious refusal is a claim for statutory damages, and not a common law claim of any sort. *See* Section 375.420.[8]

The trial court properly instructed the jury regarding the Longs' burden of proof.

■ Columbia's fourth point on appeal challenges the sufficiency of the evidence to support the Longs' vexatious refusal claim. An action for vexatious refusal is based upon section 375.420. *Dhyne v. State Farm Fire & Cas. Co.*, 188 S.W.3d 454, 457 (Mo. banc 2006). That statute establishes three elements that a plaintiff must prove in order to prevail on such a claim: (1) the existence of an insurance policy with the defendant, (2) the defendant's refusal to pay under the policy, and (3) such refusal was "without reasonable cause or excuse." *Id.* There is no dispute in the instant case about either of the first two elements. Thus, the only disputed element at trial was whether Columbia's denial of the Longs' claim was based upon "reasonable cause or excuse."

■ "Direct and specific evidence to show vexatious refusal is not required, the jury may find vexatious delay upon a general survey and a consideration of the whole testimony and all the facts and circumstances in connection with the case." *DeWitt v. Am. Family Mut. Ins. Co.*, 667 S.W.2d 700, 710 (Mo. banc 1984). At trial, the Longs presented expert testimony that insurance industry customs, standards, and practices require that, "before a denial of claim can be made, it must be fully, thoroughly, adequately investigated." That same expert testified that, on the basis of those customs, standards, and practices, Columbia's investigation of the Longs' loss was "terribly inadequate."

The Longs also introduced into evidence a five-minute tape recording of a telephone conversation between Columbia's claims adjuster and Dr. Long. That tape was played for the jury, and a written tran-

---

8. All statutes referenced are Missouri Revised Statutes (2000).

script thereof was also admitted in evidence. That transcript and tape recorded the following initial exchange:

Q. Okay. Uh, Dr. Long, uh, we've had reported to us that uh over a period of time you've had an employee by the name of Scott Sims, [sic] is that right, sir?

A. Yes.

Q. Uh, that had been working for you that apparently has been stealing numerous amounts of cattle from you, is that correct, sir?

A. Yes. Yes.

Q. Okay and uh, your uh, this, these cattle, do you know how many cattle he has stolen?

A. Not exactly at this time but our, our, our estimate is approximately 172 head.

Q. Okay, how did, how did you come to this estimate?

A. We audited our books and we audited the farm and ...

Q. You did an inventory ... ?

A. We did an inventory ...

The conversation later turned to whether Simms had admitted the theft, at which point Dr. Long mentioned that he had confronted Simms before any inventory was conducted. The adjuster then attempted to end the conversation, and Dr. Long asked whether an investigator would be sent out. The adjuster suggested that the loss would not be covered because it fell within an exclusion for losses disclosed on taking inventory. Dr. Long protested that this was not the case, and attempted to explain further. The final statements captured on tape are:

Q. But it's through the inventory you discovered the loss.

A. Well, I discovered the losses because of the people that work there told me that he loaded the cows out, then I

went and asked him and he told me he took them to the other farm, so I went down there and the cows weren't there. So then I come and take and inventory ... (tape ends)

The adjuster then sent a letter to the Longs, explaining that their claim was being denied because the loss was disclosed on taking inventory. A reasonable juror could conclude from the evidence presented that Columbia did not conduct a good faith investigation into the Longs' claim. Because there was sufficient evidence to support the jury's determination that Columbia refused the Longs' claim without reasonable cause or excuse, the trial court properly denied Columbia's motions for directed verdict and for judgment notwithstanding the verdict.

Columbia's fifth point on appeal asserts that the trial court erred by sustaining objections to its closing argument. Those objections generally prevented Columbia from arguing that the disputed policy exclusions, discussed above, precluded coverage under the policy. As already noted, the trial court's actions throughout trial were consistent with a theory that those policy exclusions were relevant to a determination of whether Columbia acted vexatiously but not to the question of whether the policy covered the Longs' loss.

During closing argument, Columbia's first reference to the disputed policy language drew an objection. During a sidebar regarding that objection, Columbia asserted: "You Honor, I think it's appropriate argument because I'm discussing this in the context of the reasons for the denial under the claim that it was vexatious." The trial court then overruled the objection, and Columbia proceeded to argue that its refusal was not vexatious if it was based upon the policy exclusions.

The trial court's rulings during closing argument properly confined Columbia to arguments in conformity with the jury instructions given, and we find no error in those rulings.

■ Columbia's final point on appeal challenges the trial court's denial of its post-judgment motion to reduce the verdict in accordance with a co-insurance clause contained in the policy. The co-insurance clause provides: "[Columbia] pay[s] no more than that portion of the loss which the 'limit' for each class bears to the percentage shown on the 'declarations' of the actual cash value of all property covered under that class at the time of loss." The trial court's ruling was based upon the trial court's finding that Columbia's requested application of the co-insurance provision constituted an affirmative defense or avoidance, which must be set forth in a responsive pleading lest it be waived. Rule 55.08.

In response to this finding, Columbia relies upon *Noll v. Shelter Insurance Cos.*, 774 S.W.2d 147 (Mo. banc 1989), for the proposition that "[i]t is not necessary to plead as affirmative defenses policy provisions defining the coverage." *Id.* at 149. Thus, Columbia argues, the co-insurance provision at issue in the instant case is not an affirmative defense or avoidance. Columbia's reliance on *Noll* is misplaced.

Unlike the anti-stacking provision at issue in *Noll*, the co-insurance provision at issue here requires the proof of facts not necessary to the Longs' original suit. At issue in *Noll* was the applicability of a provision that prohibited recovery under multiple policies covering the same risk. *Id.* The provision under consideration in *Noll* specified that where more than one policy is issued, "the total limit of [the insurer's] liability under all such policies shall not exceed the highest applicable limit of liability or benefit amount under any

one such policy." *Id.* In order for such a provision to be relevant, the insured must first file a claim for recovery under multiple policies, asserting an aggregate liability greater than the highest policy limit. In the course of doing so, the insured will plead all facts necessary to establish the applicability of the anti-stacking provision.

■ The instant case is distinguishable. The Longs were not required to plead, and in fact did not plead, the actual cash value of the insured property at the time of loss. "An affirmative defense contemplates additional facts not included in the allegations necessary to support plaintiff's case and avers that plaintiff's theory of liability, even though sustained by the evidence, does not lead to recovery because the affirmative defense allows the defendant to avoid legal responsibility." *Parker v. Pine*, 617 S.W.2d 536, 542 (Mo. App. W.D.1981).

Because Columbia's reliance on the co-insurance provision requires proof of facts "not necessary to support plaintiff's case," *Wilson v. Motors Ins. Corp.*, 349 S.W.2d 250, 253 (Mo.App.1961), Columbia has asserted an affirmative defense. As such, Columbia was required to plead the co-insurance provision in its initial response to the Longs' suit. Rule 55.08.

The trial court properly denied Columbia's motion to reduce the verdict.

■ As a cross-appeal, the Longs assert error in the trial court's denial of their motion to amend the judgment to include prejudgment interest. Awards of prejudgment interest in Missouri are governed by statute. The relevant statute mandates that "[c]reditors shall be allowed to receive interest at the rate of nine percent per annum, when no other rate is agreed upon, for all moneys after they become due and payable, on written contracts." Section 408.020.

■ Where the damages involved are liquidated, application of section 408.020 is mandatory, rather than discretionary. *Huffstutter v. Mich. Mut. Ins. Co.*, 778 S.W.2d 391, 395 (Mo.App. E.D.1989). The Longs' request for application of that statute was denied on the basis that their damages were not liquidated before trial. Thus, the determinative issue on appeal is whether and at what point those damages became liquidated.

■ As a general rule, damages are liquidated for purposes of prejudgment interest when the amount becomes due and is "fixed and determined or readily ascertainable by computation or a recognized standard." *J.R. Waymire Co. v. Antares Corp.*, 975 S.W.2d 243, 248 (Mo.App. W.D. 1998). "The mere fact that a party denies liability or defends a claim against him, or even the existence of a bona fide dispute as to the amount of the indebtedness, does not preclude recovery of interest...." *Twin River Constr. Co. v. Pub. Water Dist. No. 6*, 653 S.W.2d 682, 695 (Mo.App. E.D.1983) (quoting 47 C.J.S. *Interest and Usury*, section 21, at 62).

In the instant case, the amount due was fixed, by the insurance policy itself, as the value of the stolen cattle. Neither Columbia's dispute as to the value thereof nor its denial of liability functions to convert the Longs' claim into one for unliquidated damages. "To hold otherwise would allow an insurer to accrue pecuniary benefit unfairly by the simple expedient of producing conflicting estimates of value." *Catron v. Columbia Mut. Ins. Co.*, 723 S.W.2d 5, 8

(Mo. banc 1987) (Robertson, J., concurring).

■ Similarly, the fact that the Longs' loss was not quantified to Columbia's satisfaction prior to trial does not prevent a holding that the claim was liquidated. The mere fact that the amount was not "fixed and determined" is of no legal significance if that amount was "readily ascertainable by computation or a recognized standard." See *J.R. Waymire Co.*, 975 S.W.2d at 248.

The rule that prejudgment interest is not to be awarded on unliquidated claims is based upon "the idea that where the person liable does not know the amount he owes he should not be considered in default because of failure to pay." *Fohn v. Title Ins. Corp. of St. Louis*, 529 S.W.2d 1, 5 (Mo. banc 1975). From the date that the Longs reported their loss, Columbia was in a position to conduct a full investigation into that loss. Indeed, the Longs repeatedly asked that Columbia do so. In refusing to do so, Columbia declined an opportunity to examine the Longs' records detailing the quantity of missing cattle and the value thereof. Columbia does not argue that the amount of the Longs' loss could not be determined from those records; instead, Columbia asserts that the Longs themselves failed to accurately value their loss. This argument is disingenuous at best: the Longs filed a timely proof of loss.[9] That Columbia denied liability and failed, for over four years, to fully investigate that loss cannot now stand as a basis for denying the Longs a recovery that accounts for the time-value of the amounts owed them under the policy.

9. We are unpersuaded by Columbia's argument that the Longs themselves should have done something more than they did to value the loss. It is irrelevant for present purposes that Simms' confession and conviction involved different numbers or that the Longs proved less at trial than what they claimed as their full loss. Trial evidence established that the Longs attempted to ascertain the exact loss by auditing their records and examining their herd. Having already denied the claim, Columbia took no part in these efforts and is in no position to suggest that the amount of that loss was not readily ascertainable by reasonable means.

## Conclusion

The judgment below is affirmed, but the cause is remanded to the trial court for a determination of when payment became due under the policy and an adjustment of the award to reflect interest at the statutory rate from that time until the date of judgment.

VICTOR C. HOWARD, Chief Judge, and PAUL M. SPINDEN, Judge, concur.