Stephen COMENS, M.D., Appellant,

v.

**SSM ST. CHARLES CLINIC MEDICAL GROUP, INC.,**
Respondent.

No. ED 94793.

Missouri Court of Appeals,
Eastern District,
Division Two.

March 8, 2011.

---

Jerome J. Dobson, St. Louis, MO, for Appellant.

Kathi L. Chestnut, St. Louis, MO, for Respondent.

## *OPINION*

GEORGE W. DRAPER III, Judge.

Stephen Comens, M.D., (hereinafter, "Doctor") appeals from the trial court's judgment denying his motion for prejudgment interest against SSM St. Charles Clinic Medical Group, Inc. (hereinafter, "the Clinic"). Doctor raises one point on appeal, arguing the trial court erred in denying his motion to amend the judgment to include an award of prejudgment interest in that his damages were liquidated. We reverse and remand for further proceedings.

Doctor specializes in noninvasive cardiology and began working for the Clinic in 1988 as a salaried employee. As part of his job duties, Doctor would read and interpret diagnostic tests, known as graphics, for the Clinic. Doctor also read graphics for other hospitals in the St. Charles area and was paid directly by those hospitals for that service. The Clinic was aware Doctor read graphics for other hospitals, and Doctor did not use any resources of the Clinic when performing this outside work.

In 1994, SSM HealthCare purchased the Clinic, along with all of the physicians' practices who were affiliated with the Clinic.[1] On July 19, 1994, Doctor signed an employment contract with the Clinic. The contract was for a term of five years, and it automatically renewed for successive one year terms thereafter unless Clinic or Doctor provided 120 days' written notice of non-renewal to the other. Additionally, both parties retained the right to terminate the contract without cause by providing the other with 120 days' notice.

The employment contract governed how Doctor's compensation would be determined. Section 2 provided in pertinent part: "Clinic will pay [Doctor] compensation based on the compensation plan established by the [Clinic] Compensation Committee appointed by the Clinic Board of Directors and approved by a majority of the Clinic Board of Directors." The compensation plan charged physicians for direct and indirect expenses across twenty categories. The parties expressly agreed

---

1. The Clinic changed its name as a result of this purchase to SSM St. Charles Clinic Medical Group. We will continue to refer to the entity as the Clinic.

to exempt Doctor's contracts with other hospitals for graphic reading from his employment contract and stated the revenues generated from the outside work would be paid directly to him. During this initial five year period, the Clinic did not object to Doctor performing this additional work and retaining those revenues.

On October 18, 1999, the Clinic's executive director, John Avants (hereinafter, "Avants"), informed Doctor the Clinic was changing the way it compensated all of its physicians, effective October 1, 1999. The memo stated "the new compensation plan ... was developed by the Compensation Committee and approved by the ... Board." The new compensation plan calculated net revenue, then subtracted clinic support services, professional expenses, malpractice expenses, and indirect expenses to arrive at the net available compensation. The indirect expenses category varied based upon the physician's specialty. The new compensation plan imposed a $50,000 annual "flat overhead rate" to noninvasive cardiologists, along with a tiered percentage of all revenue generated, which varied based upon the nature of the work performed. The Clinic made Doctor aware that his outside revenue for reading graphics at other hospitals was a "major consideration" when formulating the flat overhead rate.

After reviewing the new compensation plan, Doctor and other cardiologists expressed their disagreement with it, both in writing and orally, specifically challenging the $50,000 flat overhead rate. Doctor wrote a letter to the president of the Clinic on November 29, 1999, expressing his objection and asking that the new compensation plan be revised. Doctor did not receive a response to his letter.[2] Doctor also

consulted an attorney in February 2000, who sent a letter to the Board on February 24, 2000, asking that the flat overhead rate be removed from the new plan and the funds deducted from Doctor's compensation since October 1999 be restored. The letter further opined the Clinic was in breach of Doctor's employment contract by attempting to offset Doctor's outside graphics income, which he was entitled to under his employment contract, against his Clinic income. Doctor again received no response to this letter.

Doctor and another noninvasive cardiologist appeared at a board meeting in June 2000 to address this issue. Doctor again requested that the flat overhead rate be removed and the compensation plan be revised. Doctor also sent a letter on June 13, 2000, listing his concerns and offering alternatives to the flat overhead rate. The Board responded on July 31, 2000, informing Doctor the compensation plan would not be revised.

While Doctor remained employed by Clinic, he continued to express his concerns regarding the compensation plan, always specifically referencing the $50,000 annual flat overhead rate. None of Doctor's concerns or complaints resulted in any change to the compensation plan despite protests in November 2002, June 2003, October 2004, and August 2005.

Doctor filed a breach of contract claim against the Clinic on September 15, 2005. Doctor explained he refrained from filing suit earlier because his employment contract contained a clause which stated, "The failure of Clinic or [Doctor] to object to or take affirmative action with respect to any conduct of the other that is in violation of the provisions of this agreement, shall not

---

2. Doctor was invited to attend a compensation committee meeting in February but did

not attend.

be construed as a waiver of that violation or of any future violations of the provisions of this agreement." Doctor read this clause to mean that if he felt there had been a breach of his employment contract, he did not need to take immediate legal action in order to preserve his legal rights in the future. Doctor also feared filing a lawsuit would result in his termination from the Clinic. Shortly after Doctor filed his claim, the Clinic notified Doctor that it was terminating his employment effective April 30, 2006, because of the filing of the lawsuit. In his first amended petition for damages, Doctor alleged the Clinic breached his employment contract and referenced only the $50,000 annual flat overhead rate as objectionable.

The case was tried by a jury, wherein the parties presented evidence regarding their respective theories about Doctor's damages. The jury returned a unanimous verdict in Doctor's favor, finding the Clinic had breached two provisions of his employment contract. The jury found the Clinic had violated Section 2 of Doctor's employment contract, in that the $50,000 flat overhead rate was not established by the Clinic's compensation committee before it was passed by the board of directors. The jury also found the Clinic breached Doctor's employment contract by taking into consideration all of his revenue from reading graphics at other hospitals when imposing the $50,000 flat overhead rate when his contract specifically provided Doctor would retain those revenues for himself. The jury awarded Doctor $329,166 in damages.[3] Doctor filed a post-trial motion to amend the judgment to include an award of prejudgment interest. After the motion was called, heard, and submitted, the trial

court entered its judgment denying Doctor's motion. Doctor appeals.

■ Our review of Doctor's point involves the application and interpretation of Section 408.020 RSMo (2000).[4] The interpretation and application of a statute to a given set of facts is a question of law. *McKinney v. State Farm Mut. Ins.*, 123 S.W.3d 242, 245 (Mo.App. W.D.2003). Therefore, this Court's review is *de novo*, giving no deference to the trial court's judgment. *Strong v. American Cyanamid Co.*, 261 S.W.3d 493, 522 (Mo.App. E.D. 2007).

■ Missouri statutes govern the award of prejudgment interest. *Columbia Mut. Ins. Co. v. Long*, 258 S.W.3d 469, 479 (Mo.App. W.D.2008). Section 408.020 allows plaintiffs to recover prejudgment interest at a rate of nine percent when no other rate is agreed upon, for liquidated claims after demand of payment is made. *Hawk Isolutions Group, Inc. v. Morris*, 288 S.W.3d 758, 762 (Mo.App. E.D.2009). "The purpose of statutory prejudgment interest is to promote settlement of lawsuits and fully compensate plaintiffs by accounting for the time-value of money." *Children Intern. v. Ammon Painting Co.*, 215 S.W.3d 194, 203 (Mo.App. W.D.2006). In order for a claim to be liquidated, the amount must be fixed and determined or readily ascertainable by computation or reference to recognized standards. *Hawk Isolutions Group*, 288 S.W.3d at 762.

■ In his sole point on appeal, Doctor argues the trial court erred in denying his post-trial motion to amend the judgment to include an award of prejudgment interest. Doctor avers his damages for breach of contract are liquidated, in that the Clinic could have readily ascertained the amount

---

**3.** The Clinic has satisfied the judgment and does not challenge the jury's verdict or damages award on appeal.

**4.** All statutory references are to RSMo (2000) unless otherwise indicated.

it owed him because he consistently challenged the imposition of the $50,000 flat overhead rate. The Clinic disagrees, arguing the parties hotly disputed the appropriate measure and amount of damages, rendering Doctor's claim for prejudgment interest unliquidated and not readily ascertainable.

■ The proper measure of damages is a question of law for determination by the trial court, which this Court reviews *de novo*. *H & B Masonry Co., Inc. v. Davis*, 32 S.W.3d 120, 124 (Mo.App. E.D.2000). When the parties dispute the measure of damages, the claim is not liquidated and prejudgment interest is not appropriate. *See Ken Cucchi Constr., Inc., v. O'Keefe*, 973 S.W.2d 520, 528 (Mo.App. E.D.1998)(denial of prejudgment interest where plaintiff argued diminution in value was proper measure of damages while defendants contended replacement cost was proper measure); *St. John's Bank & Trust Co. v. Intag, Inc.*, 938 S.W.2d 627, 630 (Mo.App. E.D.1997)(disputed measure of damages since inception of lawsuit precluded prejudgment interest).

The Clinic argues the measure of damages for the breach of an employment agreement based on compensation should be the difference between what Doctor earned as a result of the breach and what he would have earned absent the breach. Doctor agrees this is the appropriate measure of damages and contends the only dispute is with respect to the amount of compensation Doctor would have earned absent the breach. We agree with Doctor that the dispute here pertains to the amount of damages, not the appropriate measure of damages.

The jury was presented with three divergent theories on how to calculate Doctor's damages. First, Doctor alleged the Clinic breached his employment contract by charging him the $50,000 flat overhead rate. Accordingly, Doctor claimed his damages were $4,166.67 per month, beginning in October 1999, when the new compensation plan instituted the flat overhead rate, and continued for the next seventy-nine months, until Doctor was terminated in April 2006. Doctor argued the total damages he incurred were $329,166.

■ Second, the Clinic presented Avants' testimony wherein he explained his calculations of what Doctor's income would be under the old compensation plan compared to the new compensation plan. Under this calculation, Avants testified Doctor incurred $141,908 in damages. Doctor argued this theory was unsupported by the evidence presented at trial. We agree. This calculation assumed that had the Clinic not breached Doctor's employment contract, his income would be calculated under the old compensation plan. However, the Clinic conceded no physicians were able to enforce the old compensation plan after the new plan was in place. Avants' analysis also failed to take into account the full duration of Doctor's employment, in that it only calculated his damages from October 1999 through May 2005, and Doctor's employment did not terminate until April 2006.

■ Third, Avants testified the measure of damages should be the difference between what Doctor's compensation would have been with the flat overhead rate and what his compensation would have been before the Clinic's board imposed the rate and lowered the tiered percentages. Avants explained this would require calculating Doctor's compensation using the originally proposed higher tiered percentages that the board considered before implementing the flat overhead rate and lower tiered percentages. Under this theory, Avants testified Doctor would have incurred $153,192 in damages. Doctor chal-

lenged this calculation on the same grounds as the previous theory, and we find this challenge has merit. Specifically, the evidence adduced at trial supports the finding that the higher tiered percentages were never approved by the compensation committee or implemented by the board, and therefore, had no relevance to Doctor's calculation of damages. Moreover, Avants' calculation only analyzed Doctor's compensation from October 1999 through May 2005; it did not calculate damages for the full duration of Doctor's employment through April 2006.

■■■■ "The mere fact that a party denies liability or defends a claim against him [or her], or even the existence of a bona fide dispute as to the amount of the indebtedness, does not preclude recovery of interest...." *Columbia Mut. Ins.*, 258 S.W.3d at 480 (*quoting Twin River Constr. Co. v. Pub. Water Dist. No. 6*, 653 S.W.2d 682, 695 (Mo.App. E.D.1983)). "To hold otherwise would allow [the opposing party] to accrue pecuniary benefit unfairly by the simple expedient of producing conflicting estimates of value." *Columbia Mut. Ins.*, 258 S.W.3d at 480 (*quoting Catron v. Columbia Mut. Ins. Co.*, 723 S.W.2d 5, 8 (Mo. banc 1987) (Robertson, J., concurring)). An exact calculation of damages need not be presented in order for the claim to be considered liquidated. *City of Sullivan v. Truckstop Restaurants, Inc.*, 142 S.W.3d 181, 195 (Mo.App. E.D.2004). Damages may still be ascertainable, even in the face of "a dispute over monetary value or the parties' experts compute different estimates of the loss." *Jablonski v. Barton Mut. Ins. Co.*, 291 S.W.3d 345, 350 (Mo. App. W.D.2009).

Here, we find the theories put forth by the Clinic were incomplete, inaccurate, and unsupported by the evidence adduced at trial. By contrast we hold the evidence supported a finding Doctor's damages

were liquidated because they were readily ascertainable by computation. Doctor made it clear throughout the litigation he was only challenging the withholding of the annual $50,000 flat overhead rate, not any other component of the new compensation plan, including the tiered percentage structure. It was undisputed $4,166.67 was withheld monthly from his compensation and this persisted despite Doctor's protestations, for the duration of his employment. This resulted in $329,166 in damages, which is the exact amount the jury ultimately awarded him.

Therefore, we hold the trial court erred in finding Doctor's damages were not liquidated and readily ascertainable in order to award prejudgment interest. "The award of prejudgment interest in a case in which [S]ection 408.020 is applicable is not a matter of court discretion; it is compelled." *Hawk Isolutions Group*, 288 S.W.3d at 762 (*quoting Watters v. Travel Guard Intern.*, 136 S.W.3d 100, 112 (Mo.App. E.D.2004)). Since Doctor's claim for breach of contract damages was liquidated and readily ascertainable, the trial court's judgment is reversed, and the cause is remanded with instructions to award Doctor prejudgment interest as provided in Section 408.020. Point granted.

The trial court's judgment is reversed and remanded for further proceedings consistent with this opinion.

GLENN A. NORTON, P.J., and KATHIANNE KNAUP CRANE, J., concur.