# United States Court of Appeals

## For the Eighth Circuit

_____

No. 12-1748

_____

Randy Bennett; Darla Y. Harb,

*Plaintiffs - Appellees*,

v.

Riceland Foods, Inc.,

*Defendant - Appellant.*

_____

No. 12-1833

_____

Randy Bennett; Darla Y. Harb,

*Plaintiffs - Appellants*,

v.

Riceland Foods, Inc.,

*Defendant - Appellee.*

_____

Appeal from United States District Court
for the Eastern District of Arkansas - Pine Bluff

_____

Submitted: January 16, 2013
Filed: July 19, 2013

_____

Before LOKEN, MURPHY, and COLLOTON, Circuit Judges.

_____

COLLOTON, Circuit Judge.

Randy Bennett and Richard Turney[1] brought this action against Riceland Foods, Inc., their former employer, alleging that Riceland terminated them in retaliation for filing grievances against their supervisor. The grievances complained that a supervisor at Riceland used racially discriminatory language and created a hostile work environment. The claims were submitted to a jury under 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and the Arkansas Civil Rights Act. A jury found that Riceland retaliated against the employees and awarded backpay and $300,000 in damages for emotional distress to each. The district court[2] declined to submit punitive damages to the jury. Both sides appeal, and we affirm.

I.

Riceland is a farmer-owned cooperative that mills, markets, and sells rice. Bennett and Turney are white men who were maintenance workers at Riceland's

_____

[1]Turney died while this appeal was pending, and his attorney filed a suggestion of death with this court. Within 90 days of that filing, *see* Fed. R. Civ. P. 25(a)(1), Darla Y. Harb, the executrix and representative of Turney's estate, moved pursuant to Federal Rule of Appellate Procedure 43(a) for an order substituting her as a party for Turney. We grant the motion and substitute Harb as a party.

[2]The Honorable James M. Moody, United States District Judge for the Eastern District of Arkansas.

facility in Stuttgart, Arkansas. In April 2009, Turney filed an internal grievance alleging that his supervisor, Ralph Crane, said that a black maintenance worker "smelled like a nigger." The grievance listed Bennett as one of two witnesses. Crane responded that he had no recollection of the alleged incident.

If a grievance is not resolved after the supervisor's response, Riceland's procedures provide for review by a "department manager or a representative of management designated by the company." Martin Jones, the director of warehousing, packaging, and shipping at the Stuttgart facility, conducted this review by interviewing the witnesses named in the grievance. Bennett corroborated Turney's account; the other maintenance worker whom Turney listed could not "honestly say what was said at [the] incident." Deeming these statements "[i]nconsistent," Jones concluded that "a[n] offense ha[d] not been committed" and determined the grievance "to have no merit." Around the time of this investigation, Jones told Rick Chance, the warehouse superintendent at the Stuttgart facility, that he had been unable to convince Bennett "to drop the grievance." Chance testified that Bennett's refusal to do so "made [Jones] mad" and "really bothered [Jones]."

Scott Lindsey, manager of the Stuttgart rice division, performed the next stage of the investigation. He agreed with Jones's assessment, concluding that the "[g]rievance is determined to have no merit." At trial, Lindsey testified that he based his determination on an investigation conducted by David Hoover, human resources manager of the Stuttgart rice division. Lindsey testified that Hoover "informed [him] that [Hoover] had interviewed several of the employees involved and could not find corroborating evidence" of Turney's account. Hoover testified that his investigation was limited to asking two minority maintenance workers "if they had been subjected to offensive language." Neither of these employees was involved in the grieved incident, and one told Hoover that he had heard Crane use such language.

-3-

Turney filed a second grievance—in response to Crane's use of similar racially offensive language—during the investigation into his first grievance. He filed another grievance nearly two weeks later, alleging that he had not received a response to his second grievance. Around this time, Bennett delivered a "formal complaint to [Linda Dobrovich,] the director of Human Resources . . . requesting that Ralph Crane be removed as supervisor, permanently." Bennett referred to Turney's grievances, made similar allegations regarding Crane's language, and offered to provide "documentation and witnesses." Dobrovich requested Bennett's documentation, and Bennett gave her "some, but not all, in case this [matter] goes to the [Equal Employment Opportunity Commission] or to court."

Following this meeting with Bennett, Dobrovich commenced an investigation into Crane's use of inappropriate language. In her report of May 19, 2009, Dobrovich expressed doubt about Crane's denial of using offensive language in the workplace. She noted that "[i]f Mr. Crane remains in a leadership position, he should understand that he will be held accountable for his behavior and language. . . . It is strongly recommended that he attend some diversity training if he continues as the crew foreman." Riceland subsequently required Crane to complete a computer-assisted diversity training program.

Riceland's CEO had issued a directive to division heads to reduce operating costs in early 2009. On June 29, 2009, Jones proposed reorganizing the Stuttgart facility's warehousing, packaging, and shipping department's maintenance staff "[d]ue to financial considerations." His proposal called for "reassigning 2 positions currently working in the warehouse [*i.e.*, the positions of Bennett and Turney] to other open positions in the company," outsourcing one of those positions, and using Riceland's central maintenance staff to perform the work of the other eliminated position.

Under Riceland company policy, such job eliminations required the approval of Lindsey as manager of the division, the human resources department, the vice president of rice milling and engineering, and Riceland's CEO. Lindsey determined that "the proposal had merit," because the Stuttgart facility was the only Riceland facility that had not "contracted [its] maintenance out to a professional service." Dobrovich from human resources concluded that eliminating the positions was consistent with the practices in effect in the other Riceland facilities, and that "it was a good business decision." Lindsey testified that both the vice president of rice milling and engineering and the CEO approved the reorganization. But Chance, the warehouse superintendent, testified that the job eliminations were a poor business decision and would not have occurred if Bennett and Turney had not pursued their grievances.

On June 30, 2009, Jones informed Bennett and Turney that their positions would be eliminated and that they "would be terminated at the end of the day on July 30, 2009." At the time of the proposal and job-elimination decision, Riceland's maintenance staff included several workers junior to Bennett and Turney. Although Riceland's policies list seniority as a factor in layoff decisions and do not provide specifically for "job eliminations," Dobrovich testified that seniority is irrelevant to job-elimination decisions.

Bennett and Turney filed charges with the EEOC, which issued each a notice of right to sue. They then brought this action, alleging that Riceland terminated them in retaliation for their grievances, in violation of Title VII, 42 U.S.C. § 1981, and the Arkansas Civil Rights Act. They advanced the so-called "cat's paw" theory of liability, seeking to hold Riceland liable for the discriminatory animus of a supervisor (Jones) who influenced but did not make the ultimate decision on their employment. At trial, each of the employees testified briefly to the emotional distress he suffered as a result of his termination. Turney testified that "the stress . . . [wa]s immense" and that he was "[n]ot . . . able to sleep at night." Bennett testified that the situation was

"depressing, causes you not to sleep at night, causes stress at home with other people, people that's dependent on you." He testified further that he suffered from "stress" and that he worried about the future. The jury found that Riceland retaliated against the employees and awarded each lost wages and benefits, plus $300,000 for emotional distress.

Riceland moved for judgment as a matter of law on the basis that neither of "these two nonminority plaintiffs can state a claim under [§] 1981." The district court denied the motion, finding that sufficient evidence had been presented to show that the employees' "complaints of the use of racial epithets by Mr. Crane in the workplace were made in an attempt to vindicate the rights of minorities." Riceland also moved for judgment as a matter of law during trial and for judgment as a matter of law notwithstanding the verdict on the basis that the evidence was insufficient to submit the retaliation claims to the jury. The district court denied the motions, noting that the employees had presented sufficient evidence to establish that they had participated in a protected activity—*i.e.*, filing grievances about Crane's use of racial epithets—and that Riceland terminated them in retaliation for that activity.

In denying Riceland's motions for judgment as a matter of law and for new trial or remittitur on compensatory damages, the district court held that the employees' evidence "was sufficient to present the compensatory damages issue to the jury as both . . . testified to depression, extreme stress, worry and sleeplessness," and that the evidence supported the jury's $300,000 emotional-distress award to each employee. But the district court did not accept the employees' proffered jury instruction on punitive damages, concluding that there was insufficient evidence "from which the jury could conclude that any of the decision-makers here acted with [the] malice or reckless indifference [necessary] to award punitive damages."

Riceland appeals the district court's denial of several motions. The employees cross-appeal the district court's refusal to instruct the jury on punitive damages.

## II.

Riceland challenges the district court's denial of its motion for judgment as a matter of law on the employees' retaliation claims. The company asserts that there was insufficient evidence from which a jury could find a causal connection between the employees' grievances and their termination. We view the sufficiency of the evidence in the light most favorable to the verdict, drawing all reasonable inferences in favor of the nonmoving party. *Brown v. Fred's, Inc.*, 494 F.3d 736, 740 (8th Cir. 2007).

To establish a retaliation claim under Title VII, an employee must show that he engaged in statutorily protected conduct, that he suffered an adverse employment action, and that the protected conduct was a but-for cause of the adverse action. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2013 WL 3155234, at *16 (June 24, 2013); *McCullogh v. Univ. of Ark. for Med. Scis.*, 559 F.3d 855, 864 (8th Cir. 2009). Although it is not dispositive, "the length of time between protected activity and adverse action is important" in the causation calculus. *Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 833 (8th Cir. 2002). In a cat's paw case, an employer may be vicariously liable for an adverse employment action if one of its agents—other than the ultimate decision maker—is motivated by discriminatory animus and intentionally and proximately causes the action. *See Staub v. Proctor Hosp.*, 131 S. Ct. 1186, 1190-91, 1194 (2011) (applying the Uniformed Services Employment and Reemployment Rights Act, which is "very similar to Title VII").

The employees supported their case with evidence that Jones, who proposed eliminating the employees' jobs, was "mad" and "bothered" that he could not convince the employees to drop their complaints. They demonstrated that neither Jones nor Lindsey engaged in a meaningful investigation of their grievances. They also showed that Jones proposed—and Lindsey and upper management approved—eliminating the employees' jobs six weeks after Dobrovich found their

grievances to have merit. And the employees produced testimony from the warehouse superintendent that eliminating their positions was unnecessary from a business perspective and would not have happened but for their grievances.

Riceland explains its decision to eliminate the employees' positions as strictly a cost-cutting measure in furtherance of the CEO's directive to reduce operating costs. To bolster its business-judgment argument, Riceland notes that Dobrovich, the director of human resources, approved the termination decision after an independent review.

The employees' evidence of Jones's discriminatory animus was sufficient to submit their retaliation claims to the jury. Riceland's proffered non-discriminatory explanation for the terminations—cutting operational costs—failed to address Jones's discriminatory motivation in proposing the warehouse reorganization plan. And Riceland's argument that Dobrovich's review cured Jones's discriminatory motivation is unavailing. The *Staub* Court specifically noted that such an "independent investigation" does not "somehow relieve[] the employer of fault. The employer is at fault because one of its agents committed an action based on discriminatory animus that was intended to cause, and did in fact cause, an adverse employment decision." *Staub*, 131 S. Ct. at 1193 (internal quotation marks omitted).

Riceland next challenges the district court's decision to instruct the jury that it could award damages for emotional distress. The evidence of emotional distress was limited to testimony from the plaintiff employees. Turney testified that "the stress from [his termination] [wa]s immense" and that he was "[n]ot . . . able to sleep at night." Bennett testified that his termination was "depressing, causes you not to sleep at night, causes stress at home with other people, people that's dependent on you." He also testified that he suffered from stress and that he worried about the future.

A compensatory damage award for emotional distress may be based on a plaintiff's own testimony. *Forshee v. Waterloo Indus., Inc.*, 178 F.3d 527, 531 (8th Cir. 1999). Such an award must be "supported by competent evidence of genuine injury," *id.* (internal quotation omitted), but medical or other expert evidence is not required. *Kim v. Nash Finch Co.*, 123 F.3d 1046, 1065 (8th Cir. 1997). We agree with the district court that the employees' evidence is "scant" but submissible. Unlike cases in which we have held evidence of emotional distress insufficient to submit to the jury, the employees' damages were directly connected to Riceland's retaliation, persisted for a period of years, and were not remedied by obtaining new employment shortly after termination. *Cf. Forshee*, 178 F.3d at 531. The question is close, but the evidence is not insufficient as a matter of law.

We also conclude that the district court did not clearly abuse its discretion in denying Riceland's motion for new trial or remittitur. *See Haynes v. Bee-Line Trucking Co.*, 80 F.3d 1235, 1240 (8th Cir. 1996). A motion for new trial based on sufficiency of the evidence should be granted only "if the verdict is against the weight of the evidence and allowing it to stand would result in a miscarriage of justice." *The Shaw Grp., Inc. v. Marcum*, 516 F.3d 1061, 1067 (8th Cir. 2008) (internal quotation and alteration omitted). Remittitur is appropriate where the verdict is so grossly excessive as to shock the judicial conscience. *Norton v. Caremark, Inc.*, 20 F.3d 330, 340 (8th Cir. 1994). We will not order a new trial or remittitur merely because we may have arrived at a different amount from the jury's award. *See Frazier v. Iowa Beef Processors, Inc.*, 200 F.3d 1190, 1193 (8th Cir. 2000). Although the jury's awards in this case are at the statutory limit for nonpecuniary losses, 42 U.S.C. §§ 1981a(a)(1), (b)(3)(D), we have affirmed other six-figure awards for emotional distress. *See, e.g.*, *Mathieu v. Gopher News Co.*, 273 F.3d 769, 783 (8th Cir. 2001). The district court did not abuse its discretion in declining to set them aside.[3]

---

[3]Riceland also argues that 42 U.S.C. § 1981 does not provide a cause of action to a nonminority who brings a complaint on his own behalf, even if he does so in an

Finally, we affirm the district court's decision to refuse an instruction on punitive damages. Punitive damages are appropriate under Title VII where the employer not only engages in intentional discrimination but also does so with "malice or with reckless indifference to the [employee's] federally protected rights." 42 U.S.C. § 1981a(b)(1); *see also Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 535 (1999). An employer may be held vicariously liable in the punitive damages context for the "discriminatory employment decisions of managerial agents" acting within the scope of their employment, unless those decisions "are contrary to the employer's good-faith efforts to comply with Title VII." *Kolstad*, 527 U.S. at 545 (internal quotation omitted). The employees thus contend that because Jones was "acting within the scope of [his] employment" when he disregarded Riceland's anti-discrimination policy and proposed terminating them, they were entitled to a jury instruction on punitive damages.

The Court in *Kolstad* emphasized that punitive damages are not available against an employer that "ma[d]e good-faith efforts to prevent discrimination in the workplace." *Kolstad*, 527 U.S. at 545-46 (internal quotation omitted). Before Riceland reached a final decision to terminate Bennett and Turney, its head of human resources conducted an independent review of the reorganization plan "in light of their complaints" about Crane's offensive language. *Kolstad* explained that "Congress . . . sought to impose two standards of liability—one for establishing a right to compensatory damages and another, higher standard that a plaintiff must satisfy to qualify for a punitive award." *Id.* at 534. So while Dobrovich's

effort to vindicate the rights of minorities. *Cf. Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229, 237 (1969); *Gacek v. Owens & Minor Distribution, Inc.*, 666 F.3d 1142, 1146 (8th Cir. 2012). The employees' claims under Title VII and § 1981 are alternative grounds for the same judgment. *See* 42 U.S.C. § 2000e-3(a); *Gregory v. Dillard's, Inc.*, 565 F.3d 464, 468-69 (8th Cir. 2009) (en banc). As we have concluded that the judgment under Title VII should be affirmed, it is unnecessary to consider Riceland's challenge to the § 1981 claim.

investigation was not enough to absolve Riceland of "fault," *see Staub*, 131 S. Ct. at 1193, it constituted a "good-faith effort[] to prevent discrimination" sufficient to preclude a punitive damage award. It was not error for the district court to decline to submit the punitive damages issue to the jury.

\* \* \*

The judgment of the district court is affirmed.

_____