# United States Court of Appeals

## For the Eighth Circuit

_____

No. 12-1058

_____

Luisa Chavez-Lavagnino and Debra Yanez,

*Plaintiffs - Appellees*,

v.

Motivation Education Training, Inc., and
Amy Cerna, also known as Amy Cerna-Espinoza,

*Defendants - Appellants*.

_____

Appeal from United States District Court
for the District of Minnesota - Minneapolis

_____

Submitted: March 5, 2014
Filed: August 25, 2014

_____

Before RILEY, Chief Judge, COLLOTON and GRUENDER, Circuit Judges.

_____

COLLOTON, Circuit Judge.

Luisa Chavez-Lavagnino and Debra Yanez alleged that their employer, Motivation Education Training, Inc. ("MET"), and their supervisor, Amy Cerna, terminated them in violation of Minnesota law for refusing to participate in MET's attempts to defraud the federal government. The case proceeded to trial, and the jury found in favor of Chavez-Lavagnino and Yanez (the "employees"), awarding them

damages. MET and Cerna (the "defendants") appeal from the district court's denial of their motion for judgment as a matter of law. We affirm in part, reverse in part, and vacate and remand in part.

I.

Because we are reviewing the denial of the defendants' motion for judgment as a matter of law, we recite the facts in the light most favorable to the employees. MET is a non-profit corporation that provides services and training to migrant and seasonal farm workers. Much of MET's funding comes from federal grants distributed pursuant to the National Farmworker Jobs Program. Before MET may use Program funds to assist a farmworker, federal law requires MET to ensure that the worker satisfies certain eligibility requirements. *See* 29 U.S.C. § 2912. For example, a recipient must be in the country legally, he must work primarily in agriculture, and his income must not exceed a certain threshold. To confirm that a worker seeking benefits is eligible to receive them, MET requires the worker to complete an application and provide MET with certain documents. After MET assists a worker, it creates a so-called follow-up note on him. The follow-up note documents how the worker fared in the job market after receiving training or other services from MET. MET submits the information in the follow-up notes to the Department of Labor when it applies for renewal of its federal grants.

Chavez-Lavagnino began working at MET's office in Rochester, Minnesota, in September 2008. In December, Chavez-Lavagnino's supervisor, Cerna, ordered her to forge a worker's signature, because the worker failed to sign his application. Chavez-Lavagnino refused. She explained to Cerna that breaking the law could jeopardize her immigration status and cause her to lose custody of her daughter. Cerna responded, "I can see that you are not willing to go an extra mile for your job." After that incident, Cerna treated Chavez-Lavagnino differently. Cerna began to ignore Chavez-Lavagnino's questions about the job, and she began verbally abusing

Chavez-Lavagnino by calling her "stupid," disparaging her physical appearance, and mocking her ability to speak English.

In January 2009, Cerna ordered Chavez-Lavagnino to begin forging follow-up notes. Cerna explained that forging the follow-up notes would allow MET to demonstrate that its clients were performing well and strengthen its next application for grant money. Chavez-Lavagnino complied until late March or early April. Chavez-Lavagnino then told Cerna she would no longer falsify the notes, because doing so was illegal. MET fired Chavez-Lavagnino on May 1, 2009.

Yanez began working at MET in June 2008. Yanez claims that during her time at MET, Cerna instructed her to forge signatures, shred tax forms, falsify follow-up notes, and register applicants whom Yanez knew to be in the country illegally. Initially, Yanez complied, and she forged signatures on roughly seventy-five applications so that the clients could receive Program funds. When Cerna next ordered Yanez to forge signatures, however, Yanez refused. Cerna responded: "You are not willing to go above and beyond the call of duty for your job." Despite her refusal to forge signatures, Yanez shredded tax forms, falsified follow-up notes, and qualified applicants whom she knew to be ineligible until October 2008. In mid-October, Yanez told Cerna that she would no longer break the law. Cerna responded, "I guess you are not willing to go above and beyond the call of duty." After that conversation, Cerna reassigned much of Yanez's work to other employees.

On Wednesday, December 10, 2008, Yanez went home from work early because she felt sick. The next morning, she received a voicemail from one of her coworkers, Maria Davila, advising Yanez that she was fired for abandoning her post. Davila testified that Cerna had instructed her to place the call and to tell Yanez that she was fired. Yanez went to the office to collect her belongings on Friday. While Yanez was packing, she spoke with Cerna on the phone. Cerna explained that her

firing had been a mistake and told Yanez that she was welcome to resume her job. Yanez told Cerna she would think about the offer, but decided not to return to MET.

The employees initiated this action in Minnesota state court against MET and Cerna, alleging that the defendants fired them in retaliation for their refusals to follow Cerna's illegal orders, in violation of Minnesota's Whistleblower Act, Minn. Stat. § 181.932 subd. 1(3), and Minnesota common law. MET and Cerna removed the case to federal court on the basis of diversity jurisdiction. The district court dismissed the statutory claim against Cerna, but the statutory claim against MET and the common law claims against both defendants were tried to a jury.

The jury found in favor of the employees, awarding each employee the amount she sought in lost wages: $53,183.42 for Chavez-Lavagnino, and $35,241.67 for Yanez. After trial, the district court awarded the employees pre-judgment interest and attorney's fees, and denied the defendants' motion for judgment as a matter of law. We remanded the case after the defendants' first attempt to appeal the judgment, because Cerna's citizenship was not clear from the record, so we could not determine whether the district court properly exercised jurisdiction under 28 U.S.C. § 1332. *See Chavez-Lavagnino v. Motivation Educ. Training, Inc.*, 714 F.3d 1055 (8th Cir. 2013). The parties supplemented the record in the district court, and it is now clear that diversity jurisdiction was proper. We review the district court's denial of a motion for judgment as a matter of law *de novo*, viewing the evidence in the light most favorable to the verdict. *S. Wine & Spirits of Nev. v. Mountain Valley Spring Co.*, 646 F.3d 526, 533 (8th Cir. 2011).

II.

The defendants' principal argument on appeal is that the employees failed to prove a violation of either Minnesota's Whistleblower Act or the common law. The elements of the employees' statutory claims are similar but not identical to the

-4-

elements of their common law claims. *See Nelson v. Productive Alts., Inc.*, 715 N.W.2d 452, 455 n.3 (Minn. 2006) (recognizing that the common law cause of action for wrongful discharge "may well be largely duplicative of the cause of action available under the Whistleblower Act"). The statute provides that an employer "shall not discharge . . . [or] otherwise discriminate against" an employee because "the employee refuses an employer's order to perform an action that the employee has an objective basis in fact to believe violates any state or federal law . . . and the employee informs the employer that the order is being refused for that reason." Minn. Stat. § 181.932, subd. 1(3). Under Minnesota common law, "an employee may bring an action for wrongful discharge if that employee is discharged for refusing to participate in an activity that the employee, in good faith, believes violates any state or federal law." *Nelson*, 715 N.W.2d at 455 (internal quotation omitted).

## A.

The defendants first contend that the employees did not engage in protected conduct, because they failed to prove that Cerna's orders required them to break the law. Under the statute, the employees must have had an "objective basis in fact" to believe that the orders were illegal, Minn. Stat. § 181.932, subd. 1(3), and under the common law they must have held that belief "in good faith." *Nelson*, 715 N.W.2d at 455.

The Minnesota Supreme Court has not interpreted the phrase "objective basis in fact" or elaborated on what "good faith" requires in the context of a common law claim for retaliatory discharge. The term "good faith" appears in the portion of the Act that protects employees who report illegal conduct. Minn. Stat. § 181.932, subd. 1(1). A report is protected where, assuming the facts reported by the employee are true, they would "constitute a violation of law." *Kratzer v. Welsh Cos.*, 771 N.W.2d 14, 22 (Minn. 2009) (internal quotation omitted). We need not decide precisely what an "objective basis in fact" or "good faith" requires in this context,

however, because the employees' claims pass muster under any plausible interpretation of those terms.

At trial, the employees testified that they refused Cerna's orders to forge signatures, shred tax forms, qualify ineligible workers, and falsify follow-up notes. The most natural inference from the evidence was that Cerna ordered the employees to take those actions so that MET could disburse Program funds to ineligible workers, falsely report to the government that MET was helping those workers succeed, and in turn receive more grant money when MET next applied. Such orders, if executed, would have violated 18 U.S.C. §§ 1001(a) and 1002, which prohibit making false representations to and defrauding the federal government. There was thus sufficient evidence to support the jury's conclusion that the employees refused to engage in illegal activity.

B.

The defendants next argue that Yanez's discharge was not actionable under the Act or the common law, because Cerna offered Yanez her job back shortly after Yanez was fired. The parties agree that the Act and the common law contain a materiality requirement akin to that of Title VII. They further agree that we should look to cases construing Title VII to determine whether Yanez's firing was a sufficiently material adverse employment action.

According to the defendants, an employee may state a claim under the Act and the common law only if she suffers an "ultimate employment decision"—that is, a decision effecting a demotion or a reduction of salary or benefits. *See Leiendecker v. Asian Women United of Minn.*, 731 N.W.2d 836, 841-42 & n.1 (Minn. Ct. App. 2007) (internal quotation omitted). The defendants maintain that because Cerna attempted to rehire Yanez shortly after she was terminated, the temporary discharge

did not satisfy this standard. *See Keeton v. Flying J, Inc.*, 429 F.3d 259, 263-64 (6th Cir. 2005); *Pennington v. City of Huntsville*, 261 F.3d 1262, 1267 (11th Cir. 2001).

*Leiendecker* drew its "ultimate employment decision" test from this court's Title VII precedents. 731 N.W.2d at 841-42 & n.1. As the *Leiendecker* court noted, however, the Supreme Court of the United States rejected this circuit's interpretation of Title VII's anti-retaliation provision in *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 67-68 (2006). Under *Burlington*, a retaliatory action is materially adverse if it would likely dissuade a reasonable worker from engaging in protected conduct. 548 U.S. at 68-69. In *Leiendecker*, the Minnesota Court of Appeals nonetheless appeared to apply the test that the Supreme Court had rejected for federal law, while noting that *Burlington* left the standard "in doubt." *See* 731 N.W.2d at 841-42 & n.1. We must determine what rule the Minnesota Supreme Court is likely to apply. *See Badrawi v. Wells Fargo Home Mortg., Inc.*, 718 F.3d 756, 758 (8th Cir. 2013).

The defendants urge that the Minnesota Supreme Court already declined to adopt *Burlington*'s materiality standard in *Bahr v. Capella University*, 788 N.W.2d 76 (Minn. 2010). Although the claim in *Bahr* arose under the Minnesota Human Rights Act, the Minnesota Supreme Court interprets that statute in light of Title VII, *see id.* at 83, so the defendants assert that *Bahr* controls our analysis of the employees' whistleblower claims. In *Bahr*, however, the court considered only whether the employee had engaged in statutorily protected conduct. *Id.* at 81. The court did not decide whether to apply *Burlington*'s materiality standard to retaliation claims.

We think it more likely that the Minnesota Supreme Court would adopt the *Burlington* standard and apply it to the employees' claims. Title VII's materiality requirement is a judicial gloss on the meaning of "discrimination." *Washington v. Ill. Dep't of Revenue*, 420 F.3d 658, 661-62 (7th Cir. 2005). Like Title VII's

antiretaliation provision, Minnesota's Whistleblower Act makes it illegal to "discriminate against" an employee who engages in certain protected activities. *Compare* 42 U.S.C. § 2000e–3(a), *with* Minn. Stat. § 181.932, subd. 1. The Minnesota Supreme Court frequently interprets Minnesota statutes containing language similar to Title VII's in light of the Supreme Court's interpretation of Title VII, *see, e.g.*, *LaMont v. Indep. Sch. Dist. No. 728*, 814 N.W.2d 14, 21 (Minn. 2012), and we see no reason why the Minnesota court would be unlikely to do so here. Given the substantial similarities between the Act and the common law, *see Nelson*, 715 N.W.2d at 455 n.3, we believe the Minnesota Supreme Court would apply the same materiality standard to the employees' common law claims.

Under *Burlington*, Yanez presented sufficient evidence to support a finding that she suffered an adverse employment action. Yanez's last time sheet shows that MET classified the hours during which she was fired as "release time." Yanez accumulated release time during her employment at MET, and she ordinarily would have been free to use that time at her discretion, for whatever purpose she chose. T. Tr. 613-14. But here, Yanez was forced to use her release time in the wake of her termination. Sapping an employee's release time, like taking her vacation time, can amount to "an effective reduction in salary." *Washington*, 420 F.3d at 662. The prospect of being fired temporarily and charged with release time until the firing is rescinded could likely dissuade a reasonable employee from engaging in protected activity. *See Young-Losee v. Graphic Packaging Int'l, Inc.*, 631 F.3d 909, 913 (8th Cir. 2011) ("Being fired for making a discrimination complaint—even if rescinded after two days—might well dissuade a reasonable employee from making a complaint of harassment.").

C.

The defendants maintain that the employees presented insufficient evidence of causation. They contend that the only evidence tending to establish causation was the

temporal proximity between the employees' protected activities and their firings, and that the gaps between the events were too long to support the jury's verdict.

The employees relied on temporal proximity, but that was not their only evidence on causation. On timing, viewed most favorably to the employees, the record reflects that each was fired within approximately six weeks of refusing to carry out an illegal directive. The jury properly could have considered the six-week gaps as some evidence of a causal relationship between the employees' refusals and their firings. *See Bennett v. Riceland Foods, Inc.*, 721 F.3d 546, 551-52 (8th Cir. 2013). In addition, however, both employees testified that Cerna responded to their refusals by expressing doubts about their commitments to their jobs. After Chavez-Lavagnino refused to forge signatures, Cerna said "I can see that you are not willing to go an extra mile for your job." When Yanez announced her decision to cease all illegal conduct, Cerna replied "I guess you are not willing to go above and beyond the call of duty." The jury could have inferred from Cerna's statements that she viewed the employees' willingness to comply with her illegal orders as an important part of their jobs. Cerna's statements, in combination with the relatively short period separating the protected activities from the firings, were sufficient to support the jury's verdict.

The defendants also contend that MET vested only its executive director—not Cerna—with authority to fire employees, and that there is no evidence the executive director had a retaliatory motive. Minnesota courts have concluded that the requisite causal connection is absent "if the employer is not aware of the statutorily protected activity." *Swanson v. State*, No. A08-0553, 2009 WL 671039, at \*4 (Minn. Ct. App. Mar. 17, 2009) (unpublished); *see also Grothe v. Ramsey Action Programs, Inc.*, No. A05-1503, 2006 WL 1529447, at \*5 (Minn. Ct. App. June 6, 2006) (unpublished). But even assuming the jury agreed that only MET's executive director had authority to fire employees, the executive director is not the only relevant corporate actor. We have noted in the analogous Title VII context that "an employer may be vicariously liable for an adverse employment action if one of its agents—other than the ultimate

decision maker—is motivated by discriminatory animus and intentionally and proximately causes the action." *Bennett*, 721 F.3d at 551; *see also Staub v. Proctor Hosp.*, 131 S. Ct. 1186, 1190-91, 1194 (2011). There is Minnesota authority applying this so-called cat's paw theory in the employment-discrimination context, *see Alagok v. State*, No. A12-1658, 2013 WL 1707692, at *1, *5-6 (Minn. Ct. App. Apr. 22, 2013) (unpublished), and we think it likely that the Minnesota courts would apply the same analysis under the Whistleblower Act and the common law.

Ample testimony demonstrated Cerna's role in Chavez-Lavagnino's firing. Cerna testified that she had "constant contact" with her supervisor, that she specifically recommended Chavez-Lavagnino's termination to him, and that he passed along the recommendation to the executive director. That supervisor in turn testified that the executive director followed his recommendations "[a] lot of times, but not always." Even if the executive director did not know of Chavez-Lavagnino's refusal to violate the law, the evidence was sufficient for the jury to find that Cerna proximately caused her termination, and that Cerna was motivated by a desire to retaliate against her.

As for Yanez, the jury reasonably could have determined that MET was bound by Cerna's communication to Yanez that she was fired, because Cerna had at least apparent authority to effect Yanez's termination. Apparent authority exists when a principal holds out a person as having authority to act on the principal's behalf, and a third party—on the basis of the principal's manifestations—reasonably believes the person to have that authority. *See Powell v. MVE Holdings, Inc.*, 626 N.W.2d 451, 457 (Minn. 2001). The Minnesota courts have looked to the Restatement (Third) of Agency to guide their analysis of issues relating to agents. *See Graff v. Robert M. Swendra Agency, Inc.*, 800 N.W.2d 112, 117 n.4 (Minn. 2011); *see also Cascades Dev. of Minn., LLC v. West Bend Mut. Ins. Co.*, No. A12-2184, 2013 WL 2928150, at *4 (Minn. Ct. App. June 17, 2013) (unpublished) (discussing apparent authority and citing *Graff* as authorizing Minnesota courts to consider the Restatement (Third)

of Agency as persuasive authority). The Restatement explains that "[a]pparent authority in an organizational setting may . . . arise from the fact that a person occupies a type of position that customarily carries specific authority although the organization has withheld such authority from that agent." Restatement (Third) of Agency § 3.03 cmt. c (2006). So too, "[a] circumstance that lends weight to an appearance of authority is the fact that an organization has placed an agent in charge of a geographically distinct unit or branch or of a specific function or activity." *Id.* § 3.03 cmt. d.

Cerna testified that she was "in charge of the region which was Minnesota and North Dakota," and that the executive director relied significantly on her to manage the offices within her region. Cerna was intimately involved in Yanez's hiring: She accepted Yanez's application; she had several conversations with Yanez about the position and Yanez's qualifications; and she communicated to Yanez that she was hired. Under these circumstances, a jury could find that a reasonable employee in Yanez's position would believe that Cerna had authority to terminate her employment. MET was therefore bound by Cerna's exercise of her apparent authority, and Cerna's knowledge of Yanez's refusal to violate the law was sufficient to demonstrate causation under the Whistleblower Act and the common law. The defendants contend that Yanez did not press an argument of apparent authority in the district court, but Yanez argued at trial that MET acted through Cerna as its agent, T. Tr. 768-71, and the defendants recognized that apparent authority was raised in response to their motion for judgment as a matter of law, *see* R. Doc. 139, at 8, so there were opportunities to address the point. In any event, this court may affirm the judgment on any ground supported by the record, "even if the issue was not pleaded, tried, or otherwise referred to in the proceedings below." *Brown v. St. Louis Police Dep't*, 691 F.2d 393, 396 (8th Cir. 1982).

-11-

III.

The defendants argue that even if the verdict was supported by sufficient evidence, only employers—not supervisors—can commit the tort of wrongful discharge, so the judgment against Cerna must be reversed. The Minnesota Supreme Court has not addressed whether a supervisor may be liable for wrongful discharge, and the question has divided other courts that have considered it.

We believe the Minnesota Supreme Court is likely to hold that a supervisor cannot be individually liable for the tort of wrongful discharge. The rationale of the courts taking that view is likely to be more persuasive: Because the tort requires the existence of an employer-employee relationship, an agent "cannot commit the tort of wrongful discharge . . .; rather, he or she can only be the agent by which *an employer* commits that tort." *Miklosy v. Regents of Univ. of Cal.*, 188 P.3d 629, 644 (Cal. 2008). "Logically speaking, only 'the employer' has the power to hire or fire an employee." *Buckner v. Atl. Plant Maint., Inc.*, 694 N.E.2d 565, 569 (Ill. 1998). Individual liability for supervisors is not necessary to deter unlawful conduct by employees who induce a wrongful discharge, because the employer will be liable for discharge, and "it is likely that the employer itself will act to 'deter' that agent or employee from repeating such conduct." *Id*. at 601. Courts in several jurisdictions apply this rule. *Johnson v. Lone Wolf Wireline, Inc.*, No. 2:12CV1087, 2013 WL 1899920, at *4-5 (D. Utah May 7, 2013) (applying Utah law); *Hooper v. North Carolina*, 379 F. Supp. 2d 804, 814-15 (M.D.N.C. 2005) (applying North Carolina law); *Rebarchek v. Farmers Coop. Elevator*, 35 P.3d 892, 903-04 (Kan. 2001); *Schram v. Albertson's, Inc.*, 934 P.2d 483, 490-91 (Or. Ct. App. 1997); *Physio GP, Inc. v. Naifeh*, 306 S.W.3d 886, 888-89 (Tex. App. 2010).

The employees note that as a general matter, an agent "'is subject to liability to a third party harmed by the agent's tortious conduct,' even when the agent's conduct may also subject the principal to liability." *Graff v. Robert M. Swendra*

*Agency, Inc.*, 800 N.W.2d 112, 117 n.4 (Minn. 2011) (quoting Restatement (Third) of Agency § 7.01 (2006)). Some courts allowing supervisor liability reason that "[i]n a wrongful discharge case, the tortious act is not the discharge itself; rather, the discharge becomes tortious by virtue of the wrongful reasons behind it." *VanBuren v. Grubb*, 733 S.E.2d 919, 923 (Va. 2012). That wrongful intent, the argument goes, "is the undesirable, injurious act prohibited by the tort," and a supervisor should be held liable to the extent that she shares it. *Jasper v. H. Nizam, Inc.*, 764 N.W.2d 751, 776 (Iowa 2009). We do not think the Minnesota court would be convinced. Unless the employer has authorized the firing, the agent is without power to destroy the employment relationship, and there can thus be no discharge, wrongful or otherwise. *See Miklosy*, 188 P.3d at 645 & n.8. The supervisor has no independent capacity to commit the tort, so the general rule about agent liability reflected in *Graff* has no application here.

For these reasons, we conclude that the judgment against Cerna must be reversed.

IV.

Finally, the defendants contend that the district court erred by granting the employees' motion for pre-judgment interest and attorney's fees. They argue that the motion for pre-judgment interest was untimely and that the district court's award of $95,106.00 in attorney's fees was excessive.

A post-judgment motion for pre-judgment interest is a motion under Federal Rule of Civil Procedure 59(e), even where, as here, the prevailing party is entitled to such interest as a matter of right. *Osterneck v. Ernst & Whinney*, 489 U.S. 169, 175-76 & n.3 (1989); *Crowe v. Bolduc*, 365 F.3d 86, 92-93 (1st Cir. 2004). Under Rule 59(e), a party must file a motion to alter or amend a judgment within twenty-eight days after the entry of judgment. Fed. R. Civ. P. 59(e). The district court entered its

-13-

judgment on May 19, 2011, and the employees did not file their motion seeking interest until June 21. The motion for pre-judgment interest was therefore untimely, and it should have been rejected. *Reyher v. Champion Int'l Corp.*, 975 F.2d 483, 489 (8th Cir. 1992).

The employees sought $105,673.33 in attorney's fees. The district court determined that the hourly rate used by the employees to calculate their fees was reasonable and noted that the case had been "highly contested," but nonetheless awarded the employees only 90 percent of the amount requested, $95,106.00, because it found that the request contained some excessive charges. The defendants contend that the court should have further reduced the award, because the employees did not prevail on every claim originally raised in their complaint. They also contend that the employees' attorneys were grossly inefficient and billed time spent performing unnecessary tasks.

The Whistleblower Act authorizes an award of reasonable attorney's fees, Minn. Stat. § 181.935(a), and we review the district court's decision regarding what constitutes a reasonable fee for abuse of discretion. *Gen. Mills Operations, LLC v. Five Star Custom Foods, Ltd.*, 703 F.3d 1104, 1112 (8th Cir. 2013). In the posture that the matter was considered by the district court, we see no abuse of discretion. The employees prevailed on their claims for lost wages. The district court reasonably determined that the employees' level of success, in combination with the length and intensity of the litigation, justified awarding the employees most, but not all, of their requested fees. In this opinion, however, we reverse the judgment against Cerna. Although the district court commented that "the verdict would remain the same" regardless of Cerna's individual liability, R. Doc. 149, at 10, we cannot be sure that the award of attorney's fees would have been unaffected. Therefore, we vacate the award and remand for further consideration of the application for attorney's fees.

*        *        *

-14-

For the foregoing reasons we affirm the judgment against MET, reverse the judgment against Cerna and the award of pre-judgment interest, vacate the award of attorney's fees, and remand for further consideration of the application for attorney's fees.

RILEY, Chief Judge, concurring in part and dissenting in part.

Part III's prediction about Minnesota law does not convince me, and I respectfully dissent from that portion of the court's opinion.

Quoting a California case, the court writes without qualification that "an agent cannot commit the tort of wrongful discharge." Ante at 12 (internal quotation omitted). That premise is far from well established. See, e.g., VanBuren v. Grubb, 733 S.E.2d 919, 922-23 (Va. 2012) (joining the District of Columbia and the states of Arizona, Iowa, New Jersey, Pennsylvania, and West Virginia in holding an employer's supervisory agent may commit the tort of wrongful discharge). Yet Part III predicts Minnesota would follow California.

Like the Minnesota resident district judge in this case, I disagree. Under Minnesota law, "[a] wrongful discharge claim sounds in tort." Abraham v. Cnty. of Hennepin, 639 N.W.2d 342, 352 (Minn. 2002). Based on Graff v. Robert M. Swendra Agency, Inc., 800 N.W.2d 112, 117 n.4 (Minn. 2011), I believe the Minnesota Supreme Court would generally agree with the Supreme Courts of Iowa and Virginia:

> In a wrongful discharge case, the tortious act is not the discharge itself; rather, the discharge becomes tortious by virtue of the wrongful reasons behind it. Where those tortious reasons arise from the unlawful actions of the actor effecting the discharge, he or she should share in liability. . . . Limiting liability to the employer would follow a contract construct. Wrongful discharge, however, is an action sounding in tort.

-15-

While there are components of a contractual relationship, wrongful discharge remains a tort and tort principles must apply.

VanBuren, 733 S.E.2d at 923 (citing Jasper v. H. Nizam, Inc., 764 N.W.2d 751, 776 (Iowa 2009)).

Part III of the court's opinion rejects the VanBuren/Jasper approach because "the agent is without power to destroy the employment relationship" without employer authorization and "has no independent capacity to commit the tort" of wrongful discharge. Ante at 13. That reasoning is unpersuasive. "The tort of wrongful discharge does not impose liability for the discharge from employment, but the wrongful reasons motivating the discharge." Jasper, 764 N.W.2d at 776.

Here, the jury found Amy Cerna personally liable because her own motives and conduct were illegal. That Cerna was acting as her employer's agent and that her employer, if held liable, "likely . . . will act to deter [Cerna] from repeating such conduct," ante at 12 (quotation omitted), does not shield Cerna from liability for her own wrongful conduct because—according to well-established agency rules recognized under Minnesota law—"employers and employees are deemed to be jointly liable and jointly suable for the employee's wrongful act," VanBuren, 733 S.E.2d at 923 (internal quotation omitted). See Graff, 800 N.W.2d at 117 n.4 (the Minnesota Supreme Court citing for authority and quoting Restatement (Third) of Agency § 7.01 & cmt. b (2006) for the proposition "that an agent generally 'is subject to liability to a third party harmed by the agent's tortious conduct,' even when the agent's conduct may also subject the principal to liability").

Following Minnesota precedent and hornbook agency and tort law, I would affirm the jury's verdict.

_____

-16-