# United States Court of Appeals
## For the Eighth Circuit

_____

No. 24-1176
_____

Maxus Metropolitan, LLC

*Plaintiff - Appellee*

v.

Travelers Property Casualty Company of America

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Western District of Missouri - Kansas City

_____

Submitted: June 11, 2025
Filed: August 28, 2025

_____

Before COLLOTON, Chief Judge, ARNOLD and GRUENDER, Circuit Judges.

_____

GRUENDER, Circuit Judge.

On September 27, 2018, a catastrophic fire struck the Metropolitan, a multi-building apartment complex located in Birmingham, Alabama. It destroyed one of the Metropolitan's buildings entirely and caused varying degrees of damage to the others. The insurance carrier at the time of the fire, Travelers Property Casualty Company of America ("Travelers"), denied payment to the Metropolitan's owner, Maxus Metropolitan, LLC ("Maxus"), for certain related remediation costs. Maxus

sued Travelers for breach of contract and vexatious refusal to pay. At trial, the jury sided with Maxus and awarded it damages of $27,330,263.13. It also found Travelers liable for vexatious refusal to pay and accordingly awarded Maxus additional damages of $546,905, plus attorneys' fees as allowed under Missouri law. Travelers appeals the district court's denial of its motions for judgment as a matter of law and for a new trial as well its grant of prejudgment interest and attorneys' fees. We affirm on all issues except regarding the prejudgment interest, which we vacate and remand for recalculation.

## I. Background

On September 27, 2018, a fire destroyed "Phase 6," a standalone building that was part of the Metropolitan. The Metropolitan consisted of several buildings and was divided into six distinct "phases." At the time of the fire, all six phases of the Metropolitan were at various stages of completion, including some which were occupied by tenants. Phase 6 was still under construction. Phase 6 was connected to Phase 5 via an open-air walkway. No other direct connection existed between Phase 6 and the other phases. The fire caused severe and obvious damage to Phase 5, including broken windows, melted window frames, damaged siding, and extensive soot[1] throughout. Embers burned holes in the roofs of Phases 1-5. The interiors of Phases 1-4, however, appeared to have been unaffected by the fire.

At the time of the fire, the Metropolitan's policy with Travelers covered up to $35 million in "direct physical loss . . . or damage."[2] The policy also provided

_____

[1]The parties refer to different types of combustion byproducts, e.g., soot, ash, char. The technical distinctions between these byproducts do not affect our analysis. For simplicity, we use the term "soot" to refer to all combustion byproducts.

[2]Maxus owned the Metropolitan at the time of the fire, having recently purchased it from Bomasada Birmingham, LLC, which continued to serve as the general contractor on the project and maintained its preexisting insurance policy with Travelers. Due to the change in ownership, Maxus qualified as an additional named insured on the policy. Bomasada is not a party here.

-2-

coverage for up to $5 million in lost business income.  The policy expired just three days after the fire on September 30, 2018 and was not renewed.

Almost from the start, Maxus and Travelers experienced difficulties in their dealings with each other.  Maxus notified Travelers of the fire the very day it occurred, but Travelers did not reach a coverage determination until almost two months later.  When a month and a half had passed with no decision, Maxus filed a consumer complaint with the Alabama Department of Insurance.  Nine days later—and sixty-three days after the fire—Travelers notified Maxus that it would provide coverage.  (Travelers asserts this delay was caused by confusion as to whether a centralized intruder alarm system—which the Metropolitan lacked—was actually required, given that the policy and renewal letter had different terms in that regard.)  Four days later, on December 3, representatives from Travelers and Maxus met in person.  Travelers agreed to advance $1,000,000 for initial cleanup and emergency repair costs.  It also reiterated its previous request for documentation regarding the level of completion of Phase 6 at the time of the fire.  The parties also agreed that an environmental testing company would test Phases 5 and 6 for contaminants.  Testing was carried out in mid-December.  On March 13, 2019—after receiving the inspection report from January 15 and after several additional months of back and forth regarding required documentation—Travelers made an additional payment, bringing its total payout to $3,519,607.19.

Up to this point, neither party was concerned about possible fire damage in Phases 1-4.  Then, in April 2019, Maxus's vice president of construction visited the site and discovered evidence of soot and water damage throughout Phases 1-5.  Accordingly, Maxus hired Forensic Building Science ("FBS") to inspect Phases 1-5 for fire damage.  Upon inspection, FBS identified visible soot stains throughout Phases 1-5 that seemed to indicate smoke had entered the Metropolitan's HVAC system during the fire.  FBS gathered and sent seventy-two samples to the lab, which confirmed that all but one or two contained soot to varying degrees—from "trace" to "significant."  FBS recommended pausing construction to allow it to return to the exact same locations in two weeks for further testing.  FBS also found a large amount

of water damage, some of which it believed to have been caused by preexisting construction defects and some of which it believed to have resulted from leaks from the holes in the roof created by burning embers. Maxus informed Travelers of FBS's initial findings.

FBS issued its official report on June 5, 2019, finding that carcinogenic soot was present throughout Phases 1-5 and that extensive remediation was required, which would necessitate the evacuation of all residents and employees. Maxus immediately forwarded the report to Travelers, requesting its input as to the planned remediation. Travelers did not respond. On June 11, Maxus reached out again, requesting a response before Maxus evacuated tenants. Travelers responded the next day, explaining that it had arranged for an industrial hygienist to investigate the property and that until Travelers received that report, it could not say whether the evacuation of residents was covered under the policy. Further, Travelers noted that the hygienist's report would only provide information as to whether the evacuation costs were covered under the policy. Travelers refused to take a position on whether an evacuation was needed and explained that it "has not undertaken and will not undertake any technical, feasibility, safety, or other review of the report or opinions of" FBS.

The hygienist visually inspected the Metropolitan on June 13, 2019. He detected no odor or stains that indicated smoke infiltration. On August 2, he sent his report to Travelers and advised them against performing any additional testing. Travelers did not discuss this report with Maxus but requested that the hygienist return to perform additional testing, which he did on September 30 and October 1. Meanwhile, concerned by the FBS report, the Metropolitan had already evacuated its tenants, notifying them on June 14th that they were required to vacate by June 24th.

In mid-September, before the hygienist returned, Maxus informed Travelers that it intended to begin remediation of Phases 1-4 on October 7 and asked whether Travelers objected to this remediation. Travelers responded that it could not take a

position until after the hygienist had completed his testing. On October 9—after the hygienist had performed additional tests but before the parties had received the results—Maxus signed a contract with a construction company to begin remediation. Remediation on each floor required installing a temporary plastic containment to eliminate cross-contamination between floors; removing and disposing of sheetrock, carpets, and other items that could not be cleaned; temporarily removing and cleaning cabinets, countertops, appliances, trim, doors, and windows; cleaning interior wall cavities using HEPA filtration; spraying structural components with multiple coats of sealant; conducting clearance testing to confirm the absence of soot; and rebuilding.

On December 16, Travelers sent Maxus the hygienist's reports—both the report based on his June 13 visual observations and the report regarding his September 30 and October 1 tests. These reports made clear that the hygienist disputed FBS's findings and that he deemed the currently ongoing remediation to be unnecessary. Three days later, on December 19, 2019, Maxus sued Travelers in Missouri state court for breach of contract and vexatious refusal to pay. Travelers removed the case to the Western District of Missouri pursuant to federal diversity jurisdiction.

A jury trial was held. At trial, Travelers argued that that soot from the Phase 6 fire did not reach the other buildings. Rather, it claimed, any soot present in Phases 1-4 was the normal result of background contamination from the neighborhood and not from the fire.[3] It also argued that—even if present and resulting from the Phase 6 fire—microscopic soot cannot constitute "physical loss or damage" as required under the policy. As to the water damage, Travelers argued that any water damage was neither caused by the fire nor occurred during the policy period. For its part,

---

[3]Travelers restricted its arguments to the microscopic soot present in Phases 1-4, as well as any additional microscopic soot present in Phase 5 beyond that for which Maxus had already been compensated. It did not contest at trial, nor does it contest on appeal, that the policy covered remediation expenses for the heavy, visible soot in Phase 5.

Maxus asserted that both the soot remediation and the water damage resulting from the leaks created by the burning embers were covered under the policy. It also argued Travelers was liable under Missouri law for vexatious refusal to pay and therefore subject to additional damages as well as an attorney's fees award. *See* Mo. Rev. Stat. § 375.420 (2024) (providing that an insurance company that "has refused to pay . . . without reasonable cause or excuse" may be subject to pay additional damages as well as "a reasonable attorney's fee"). Maxus presented the FBS consultant—a currently-licensed building code official—who had produced the relied-upon report. The FBS consultant critiqued the testing methodology of Travelers' industrial hygienist, suggesting that he purposely chose to sample in locations where soot was unlikely to be discovered and had even cleaned each location before gathering a sample. For its part, Travelers critiqued the background of the FBS consultant, suggesting that he lacked the professional credentials and educational background to serve as an expert witness.

The jury sided with Maxus and awarded all it had requested: $27,330,263.13 in damages, $546,905 for vexatious refusal to pay, and "reasonable attorneys' fees." After trial, Maxus moved for calculation and award of attorneys' fees and for alteration of the judgment to include pre- and post-judgment interest. The district court granted both motions. When calculating the attorneys' fees award, it included fees accrued before the complaint was filed as well as fees accrued by paralegal professionals and other litigation support staff. Travelers moved for judgment as a matter of law and for a new trial, which the district court denied. On appeal Travelers raises six issues: (1) whether the presence of microscopic soot may constitute "direct physical loss or damage," (2) whether Maxus was required to prove the water damage occurred during the policy period, (3) whether Maxus presented sufficient evidence that Travelers vexatiously refused to pay Maxus's claims, (4) whether Travelers is entitled to a new trial due to erroneous jury instructions, (5) whether the district court abused its discretion when calculating the attorneys' fees award, and (6) whether the district court properly calculated and awarded prejudgment interest.

## II. Discussion

### A. Microscopic Soot

We first address Travelers' contention that it was entitled to judgment as a matter of law because Maxus failed to prove the presence of microscopic soot in Phases 1-4 constituted a "direct physical loss of or damage to" property as required under the policy. We review the denial of a motion for judgment as a matter of law *de novo*, reviewing the sufficiency of the evidence to support the jury's verdict in the light most favorable to the prevailing party, and affirming unless no reasonable juror could have reached the same conclusion. *Joseph J. Henderson & Sons, Inc. v. Travelers Prop. Cas. Ins. Co. of Am.*, 956 F.3d 992, 996 (8th Cir. 2020). "Judgment as a matter of law is appropriate only when the record contains no proof beyond speculation to support the verdict." *Wilson v. Brinker Int'l, Inc.*, 382 F.3d 765, 770 (8th Cir. 2004) (citation modified). Therefore, we "will not set aside a jury verdict unless there is a complete absence of probative facts to support the verdict." *Id.* at 769 (internal quotation marks omitted).

Travelers asserts that the policy language—"direct physical loss of or damage to" property—covers remediation only to the extent the soot either caused physical harm to the property or rendered it uninhabitable. It argues that Maxus failed to prove the presence of microscopic soot satisfies this standard—first, because microscopic soot does not constitute direct physical loss or damage, and second, because Maxus failed to establish that the soot made the property uninhabitable.

Sitting in diversity, we apply state substantive law. *Sanborn Savings Bank v. Freed*, 38 F.4th 672, 677 (8th Cir. 2022). The parties here agree that Missouri law governs. Missouri courts have yet to address whether or when the presence of microscopic soot might constitute physical damage. When facing an undecided matter of state law, federal courts must make an "Erie-educated guess" as to what the state supreme court would decide if it were in our shoes. *BSI Constructors, Inc.*

*v. Hartford Fire Ins. Co.*, 705 F.3d 330, 332 (8th Cir. 2013).  To do this, we may "turn to other jurisdictions for persuasive guidance."  *Id.*

Few courts have addressed whether similar policy language covers microscopic soot.  *See, e.g.*, *Shirley v. Allstate Ins. Co.*, 392 F. Supp. 3d 1185, 1187-89 (S.D. Cal. 2019) (assuming presence of soot within claimants' home could constitute a physical loss but ruling for insurer due to lack of evidence that soot was present); *Creative Consolidation, LLC v. Erie Ins. Exch.*, 311 A.3d 902, 908 (D.C. 2024) (contrasting COVID-19 virus with smoke that leaves "tangible parts of ash and soot on surfaces or in HVAC systems").  However, many courts have considered *other* microscopic contaminants.  For example, we have held—applying Missouri law—that if a policy uses the adjective "physical" to describe a loss, then there must be "some physicality to the loss or damage of property—*e.g.*, a physical alteration, physical contamination, or physical destruction."  *K.C. Hopps, Ltd. v. Cincinnati Ins. Co.*, 78 F.4th 1002, 1004-05 (8th Cir. 2023) (finding that COVID-19 contamination did not constitute physical damage).  Similarly, the Missouri Court of Appeals recently held that a policy's requirement of "'direct physical loss of or damage to' property," meant the loss or damage must be "directly material, perceptible, or tangible."  *BBX Cap. Corp. v. Scottsdale Ins. Co.*, 713 S.W.3d 590, 603 (Mo. Ct. App. 2025).  Thus, the *BBX* court reasoned, COVID-19 contamination was not a covered damage because it did not cause a "physical alteration or tangible impact to" the insured property.  *Id.* at 605.  The court took care to distinguish the COVID-19 virus from asbestos, which would be covered under the policy because "released asbestos fibers are a form of contamination that is 'permanent absent some intervention.'"  *Id.* at 606 (quoting *Olmsted Med. Ctr. v. Cont'l Cas. Co.*, 65 F.4th 1005, 1011 (8th Cir. 2023)).  The *BBX* court leaned on our reasoning in *Olmsted* where, applying Minnesota law, we reasoned that "some forms of physical contamination may support a finding of 'direct physical loss,'" if the property's "function is seriously impaired or destroyed and the property rendered useless by the presence of contaminants."  *Olmsted*, 65 F.4th at 1010-11 (citation modified).  Thus, we found that viral contamination, though in some sense "physical," was not a physical loss because "contaminated property will return to a non-contaminated state

-8-

with no intervention because the virus may die on its own in as little as a few hours." *Id.* at 1010.

*Olmsted* aligns with the reasoning of our sister circuits who have found that microscopic contaminants may constitute physical damage when they "make the structure uninhabitable and unusable." *Port Auth. of N.Y. & N.J. v. Affiliated FM Ins. Co.*, 311 F.3d 226, 236 (3d Cir. 2002) (applying New York and New Jersey law); *see also Q Clothier New Orleans, LLC v. Twin City Fire Ins. Co.*, 29 F.4th 252, 259 (5th Cir. 2022) (applying Louisiana law); *Sandy Point Dental, P.C. v. Cincinnati Ins. Co.*, 20 F.4th 327, 334 (7th Cir. 2021) (applying Illinois law). This remains true even if the structure is "intact and undamaged" if the contaminant renders "the property unusable or uninhabitable." *Q Clothier*, 29 F.4th at 259; *see also Uncork & Create LLC v. Cincinnati Ins. Co.*, 27 F.4th 926, 933 (4th Cir. 2022) (pointing out that, under West Virginia law, a physical loss "may exist in the absence of structural damage" if the property has been rendered "unusable or uninhabitable").

Therefore, for the presence of microscopic soot to qualify as a physical loss or damage, it must both (1) meet the required degree of physicality and (2) render the property unusable or uninhabitable. Here, the first criterion is easily met: Unlike a viral infection—but like asbestos—soot is "permanent absent some intervention," *Olmsted*, 65 F.4th at 1011, and thus meets the policy's physicality requirement.[4]

The second criterion presents a thornier question for which the parties offered competing evidence. Here, we need only determine whether there was sufficient evidence to support the jury's verdict. *See Baker v. John Morrell & Co.*, 382 F.3d 816, 828 (8th Cir. 2004). Travelers argues that the jury required an expert witness

---

[4]This is further reinforced by the policy itself. In a different context, it includes soot in a list of "[p]ollutants," which it defines as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, waste and any unhealthful or hazardous building materials (including asbestos and lead products or materials containing lead)."

-9-

to make a habitability determination and that the FBS consultant lacked the qualifications to testify to a structure's habitability. Travelers also points to the testimony of its own expert witness, a public health and indoor pollutants specialist, who testified that he would expect soot to pose a health risk if there were an "accumulation of residues easily visible to the eye on a variety of surfaces distributed throughout the space."

But even Travelers' own specialist testified that he would need to see additional sampling—sampling that Travelers neither performed nor requested to have performed—to be certain as to whether the soot posed a health hazard. Further, a witness who works as a public health specialist and industrial hygienist testified that test scores indicating a "moderate" amount of soot—a result achieved by nineteen of the seventy-two samples—are "out of the ordinary" and "not something to be ignored." The same witness also testified that even scores representing a "significant" impact—a result achieved by twenty-nine of the seventy-two samples—was "another level of problem" that indicated "a real significant source or sources" of combustion particles. And, regarding the FBS consultant's qualifications, while Travelers is correct that he lacked advanced scientific degrees, the jury was also informed that he had been a licensed building code official for seventeen years and as such had completed over 400 hours of classroom training, including annual training on hazardous materials. The FBS consultant testified that upon discovering the soot he was ethically required to inform Maxus of its hazardous nature and that his soot remediation plan was designed to comply with several national standards. We will not overturn the jury's verdict "unless there is a complete absence of probative facts to support" it. *Wilson*, 382 F.3d at 769. Sufficient evidence existed to support the jury's verdict.

## B. Water Damage

We next address Travelers' contention that it was entitled to judgment as a matter of law because Maxus failed to present evidence that the water damage—which was caused by the ember hole leaks—occurred before the policy expired.

Travelers argues that we should invalidate this award under the "manifestation rule" that has been adopted in some jurisdictions. *See Prudential-LMI Com. Ins. v. Superior Ct.*, 798 P.2d 1230, 1243-47 (Cal. 1990) (finding an insurer was only responsible for damage that "manifested" before the policy expired).

Even if Missouri were to adopt the manifestation rule—which, as Travelers admits, it has not yet done—Travelers' argument fails. If a jurisdiction has adopted the manifestation rule, then "the carrier insuring the risk when the damage first becomes apparent remains responsible for indemnifying the loss until the damage is complete." *Id.* at 1245. This remains true even if the insurance policy "purports to limit coverage to losses" which occurred during the policy term. *Id.* The term "manifestation" refers to "that point in time when appreciable damage occurs and is or should be known to the insured." *Id.* at 1247. Thus, if damage has manifested within the policy period but worsens after the policy expires, the initial insurer is responsible for the entirety of the damage. *See id.* On the other hand, if the cause of damage exists but lies dormant and "no damage or injury *of any kind*" occurs before manifestation, then liability is placed on the party carrying the risk when the damage finally manifests. *Id.* at 1246 (emphasis added).

Here, Travelers argues that the damage "manifested"—was known or should have been known by a reasonable insured, *id.* at 1247—when the water damage was discovered over six months after the fire. But that is a distortion of the manifestation rule, which holds insurers responsible for indemnifying a loss caused by damage that first occurs during the policy period but that worsens after the policy's expiration. *See id.* at 1245-47. Here, damage first occurred on the date of the fire, September 27, 2018, when embers burned holes in the roof. As the insurance provider on that date, Travelers is liable for any continuing damage caused by the ember-hole leaks. *See id.* at 1246. At trial, the FBS consultant testified in detail about how the ember leaks caused the water damage, distinguishing between the water damage caused by the ember-hole leaks and the water damage caused by preexisting construction defects. Even assuming Missouri would adopt the manifestation rule, Travelers was not entitled to judgment as a matter of law because sufficient evidence existed to

-11-

support the jury's finding that the water damage was covered under the policy because the fire caused the water damage and the damage had manifested before the policy expired. *See Wilson*, 382 F.3d at 769 (holding that we will not set aside the jury's verdict on appeal "unless there is a complete absence of probative facts to support the verdict").

## C. Vexatious Refusal to Pay

We next address Travelers' contention that it was entitled to judgment as a matter of law because Maxus failed to present sufficient evidence that Travelers acted vexatiously. To prove a claim of vexatious refusal under Missouri law, "the insured must show the insurer's refusal to pay the claim was willful and without reasonable cause, as the facts would appear to a reasonable and prudent person." *Morris v. J.C. Penney Life Ins. Co.*, 895 S.W.2d 73, 76 (Mo. Ct. App. 1995) (per curiam); *see also* Mo. Rev. Stat. § 375.420 (2024). Missouri usually protects insurers from vexatious refusal claims when the case "involves a reasonably litigable issue." *Morris*, 865 S.W.2d at 76. Here, Travelers argues that it was entitled to judgment as a matter of law on the vexatious refusal claim because its refusal to pay was—at a minimum—based on the existence of reasonably litigable issues. We agree that reasonably litigable issues existed. The microscopic soot claim presented a novel issue and the other coverage issues were also subject to reasonable dispute, especially given the presence of preexisting construction defects.

However, the presence of a reasonably litigable issue does not necessarily bar a vexatious refusal claim under Missouri law if "there is evidence that the insurer's attitude was vexatious and recalcitrant in refusing the claim." *Id.* A jury may find vexatiousness if the insurer refused to pay based on an inadequate investigation or if it denied liability without explanation. *Tauvar v. Am. Fam. Mut. Ins. Co.*, 269 S.W.3d 436, 439 (Mo. Ct. App. 2008). Here, Maxus presented sufficient evidence to support a finding of vexatiousness on either basis. The jury heard evidence that Travelers' inspector collected samples in locations where soot was unlikely to be discovered and employed a sampling methodology that seemed purposefully

designed to minimize the likelihood of discovering soot. Further, Travelers refused to indicate whether it would cover the soot remediation until after it had received its expert's final report, but then declined to communicate the expert's initial findings until December—after Maxus had begun remediation—despite receiving his report in August. It never even issued a denial letter or provided a justification as to why it had effectively denied coverage. Rather, in response to Maxus's requests for advice as to what would be covered, necessary, and considered reasonable, Travelers continued to reiterate that it could not "take a position." Sufficient evidence supports the jury's vexatious refusal award.

**D. Jury Instructions**

We next address Travelers' contention that the jury instructions were erroneous and that it is therefore entitled to a new trial. "In diversity cases the substance of jury instructions is a matter governed by the applicable state law. Accordingly, the jury instructions, when read as a whole, must fairly and adequately present the relevant state law." *Acad. Bank, N.A. v. AmGuard Ins. Co.*, 116 F.4th 768, 787 (8th Cir. 2024). We review the district court's choice of jury instructions for abuse of discretion. *Id.* at 786.

Travelers argues the jury instructions were erroneous because: (1) they permitted a jury to conclude that the mere presence of microscopic soot could satisfy the policy's "direct physical loss of or damage to property" requirement; (2) the district court did not instruct the jury that Maxus bore the burden of proof; and (3) the district court did not instruct the jury that damage from faulty workmanship was not recoverable. All three arguments fail.

First, regarding whether microscopic soot may constitute a physical loss, the challenged jury instructions state:

> Jury Instruction No. 18: Wherever in these instructions the phrase "direct physical loss of or damage to" is used, that means the property

has suffered some physicality to the loss or damage to the property— *e.g.*, a physical alteration, physical contamination, or physical destruction.

Jury Instruction No. 24: Your verdict must be for Plaintiff Maxus Metropolitan, LLC on the Soot Claim if you believe: *First*, that the presence of soot, ash, smoke, or char is direct physical loss or damage to property; and *Second*, that soot, smoke, or char was present at the Metropolitan . . . .

These instructions fairly and adequately present the relevant law. Instruction No. 18 explains that covered damage must have a physical component. *See K.C. Hopps*, 78 F.4th at 1004. And Instruction No. 24 requires the jury to determine whether the presence of soot constituted a "direct physical loss or damage." Further, there is no indication that Travelers' proposed instructions would have changed the verdict, as they provide no further clarification as to what might be considered a "direct physical loss or damage." *See Am. Home Assur. Co. v. Greater Omaha Packing Co.*, 819 F.3d 417, 427 (8th Cir. 2016) ("[A] new trial is necessary only when the errors misled the jury or had a probable effect on a jury's verdict."). The instructions read as a whole fairly and adequately present Missouri law on the issue of whether microscopic soot may constitute a physical loss, and we detect no abuse of discretion.

Second, we need not decide whether the district court erred by neglecting to clarify that Maxus bore the burden of proof, because Travelers failed to properly object. A party may not claim that the district court erred by omitting a jury instruction unless that "party properly requested [the omitted instruction] and . . . also properly objected." Fed. R. Civ. P. 51(d)(1)(B). "A party who objects to . . . the failure to give an instruction must do so on the record, stating distinctly the matter objected to and the grounds for the objection." *Id.* 51(c)(1). At the instructions

-14-

conference, Travelers stated that it had no objection to Instruction No. 14.[5] It later objected "to the court's failure to give any instruction on the burdens of proof under [the] insurance policy" and referenced its own proposed jury instruction, but did not explain why it believed its preferred burden of proof instruction was required. This does not constitute a proper objection. Further, Travelers' purported objection made little sense at the time, given that the district court *did* instruct on the burden of proof—in the previously-undisputed, now-contested-on-appeal Instruction No. 14. Travelers' challenge fails.

Third, the district court did not err by omitting a faulty workmanship instruction. Courts are "required to instruct the jury on a defense only when substantial evidence to support the defense has been presented." *State v. Hudson*, 643 S.W.3d 679, 686 (Mo. Ct. App. 2022). Here, Travelers argues the district court should have instructed the jury that any damages resulting from faulty workmanship, rather than the fire, were not recoverable. But Travelers failed to present *any* evidence that the claimed damages were caused by faulty workmanship. Indeed, to the contrary, Travelers' only support for a faulty workmanship instruction came from the testimony of a single witness who, as the district court pointed out, "opined that certain damages at The Metropolitan were caused by faulty workmanship but could not testify that Maxus was claiming any of those damages in the lawsuit." *Maxus Metropolitan, LLC v. Travelers Prop. Cas. Co. of Am.*, No. 20-CV-0095-FJG, 2024 WL 358232, at *11 (W.D. Mo. Jan. 3, 2024). Indeed, on appeal Travelers points to no supporting evidence but instead argues that a faulty workmanship instruction was warranted because Maxus's evidence called for that inference on its own. This is not what Missouri law requires, *see Hudson*, 643 S.W.3d at 686; therefore, the district court did not abuse its discretion.

---

[5]Instruction No. 14 read, in relevant part: "You must decide whether certain facts have been proved by the greater weight of the evidence. A fact has been proved by the greater weight of the evidence, if you find that it is more likely true than not true."

## E. Attorneys' Fees

We next address Travelers' contention that the district court abused its discretion in calculating the attorneys' fees award. Travelers argues that it should be recalculated to (1) remove any fees related to pre-suit legal advice and (2) exclude litigation expenses provided by paralegals and other litigation support team members. In Missouri, "attorneys' fees may be awarded when they are provided for in a contract or when they are authorized statutorily." *Berry v. Volkswagen Grp. of Am., Inc.*, 397 S.W.3d 425, 431 (Mo. 2013). Here, attorneys' fees are authorized by Missouri's vexatious refusal to pay statute. Mo. Rev. Stat. § 375.420 (2024) ("In any action against any insurance company to recover the amount of any loss under a policy," the court or jury may allow "a reasonable attorney's fee."). We review the grant of attorneys' fees for abuse of discretion. *Jet Midwest Int'l Co. v. Jet Midwest Grp., LLC*, 93 F.4th 408, 416 (8th Cir. 2024).

First, Travelers contends that the authorizing statute's reference to "[i]n any action" limits attorneys' fees to those accrued during litigation—and thereby excludes any accrued before the suit was filed. In support, Travelers points out that, as a penal statute, § 375.420 should be strictly construed. It also points to the Missouri Supreme Court's direction to trial judges to consider—among six other factors—"the number of hours reasonably expended on the litigation." *Berry*, 397 S.W.3d at 431. These arguments fail. Even strictly construed, § 375.420 places no parameters for when attorneys' fees may begin to accrue. Further, Missouri courts are highly deferential to a trial court's determination regarding attorneys' fees: "The trial court is deemed an expert at fashioning an award of attorneys' fees and may do so at its discretion." *Id.* at 430. To prevail, Travelers "must show the trial court's decision was against the logic of the circumstances and so arbitrary and unreasonable as to shock one's sense of justice." *See id.* at 431. Awarding attorneys' fees that accrued before a suit was filed does not shock one's sense of justice—especially considering the jury found Travelers liable for vexatious refusal to pay because of its actions during that period. *See Ray Haluch Gravel Co. v. Cent. Pension Fund of Int'l Union of Operating Eng'rs & Participating Emps.*, 571 U.S. 177, 189 (2014)

-16-

("The fact that some of the claimed fees accrued before the complaint was filed is inconsequential.").

Second, Travelers contends that the award should be reduced because § 375.420's "reasonable attorney's fee" does not include paralegal and other non-lawyer fees. However, the Missouri Supreme Court has held that "reasonable attorney fees" include "reasonably incurred, out-of-pocket litigation expenses that would normally be charged to a fee-paying client." *Wilson v. City of Kansas City*, 598 S.W.3d 888, 897 (Mo. 2020). Paralegal fees and litigation support personnel fees usually fall into this category. *See Missouri v. Jenkins*, 491 U.S. 274, 285 (1989) (finding "self-evident" that the work of paralegals and other litigation support staff should be considered part of a "reasonable attorney's fee"). The trial court did not abuse its discretion when calculating the attorneys' fees.

## F. Prejudgment Interest

We finally address Travelers' contention that the district court erred when it awarded prejudgment interest to Maxus. Missouri law provides that a party with an outstanding account is entitled to prejudgment interest so long as it has made a definite demand for payment and "the amount owed is liquidated or readily ascertainable." *Child. Int'l v. Ammon Painting Co.*, 215 S.W.3d 194, 203 (Mo. Ct. App. 2006); *see also* Mo. Rev. Stat. § 408.020 (2024). "Awards of prejudgment interest are not discretionary; if the statute applies, the court must award prejudgment interest." *Child. Int'l*, 215 S.W.3d at 203. Travelers asserts the prejudgment interest award should be reversed because: (1) Maxus failed to prove it made definite demands supporting its calculation, (2) the amount owed was not readily ascertainable before trial, and (3) a good faith dispute existed as to whether Travelers was liable. We reverse in part, finding that the district court properly awarded prejudgment interest but that it erred when it calculated the amount of interest based on the dates Maxus paid the invoices without considering the dates Maxus demanded payment from Travelers.

-17-

First, Travelers argues that the district court erred when it calculated the prejudgment interest beginning thirty days after Maxus paid its contractors' invoices, rather than when Maxus "demanded" payment from Travelers. Missouri law provides that prejudgment interest accrues on unpaid accounts "after they become due and demand of payment is made." Mo. Rev. Stat. § 408.020 (2024). The demand must be "definite as to both time and amount." *Child. Int'l*, 215 S.W.3d at 203. Here, therefore, the prejudgment interest calculation depends on the date Maxus "demanded" payment from Travelers. Maxus asserts that it demanded payment the very day of the fire. But it would have been impossible to reasonably ascertain the amount of damage at that time. And, indeed, the district court did not calculate prejudgment interest based on when the damage occurred but rather based on when Maxus paid each invoice—in other words, after the amount due had become "readily ascertainable." *See Columbia Mut. Ins. Co. v. Long*, 258 S.W.3d 469, 480 (Mo. Ct. App. 2008). The record is unclear as to when Maxus forwarded the invoices to Travelers. Missouri law does not allow interest to be charged on an account until payment for it has been demanded. Mo. Rev. Stat. § 408.020 (2024). If Maxus delayed in forwarding invoices to Travelers, then the prejudgment interest calculation must be based on the date each invoice was forwarded, and thus demanded, not based on the date each invoice was paid by Maxus. Therefore, further fact finding is necessary to determine when Maxus forwarded the invoices to Travelers. Then, if the facts require, the amount of prejudgment interest must be recalculated based on the dates Maxus demanded payment from Travelers rather than the dates Maxus paid the invoices.

Second, Travelers argues that prejudgment interest was improperly awarded because the damages were not "liquidated" before trial, but rather required judgment calls to determine which invoices were related to fire damage and which were caused by construction defects. This argument fails. Damages are considered "liquidated" once they have become due and are either fixed and determined or are "readily ascertainable by computation or a recognized standard." *Long*, 258 S.W.3d at 480. "An exact calculation of damages need not be presented in order for the claim to be considered liquidated." *Comens v. SSM St. Charles Clinic Med. Grp., Inc.*, 335

-18-

S.W.3d 76, 82 (Mo. Ct. App. 2011). Even when the parties dispute the value or proper computation of damages, damages may still be ascertainable. *Id.* Here, damages were readily ascertainable at the time each invoice was issued. Like in *Long*, "[f]rom the date that [Maxus] reported [its] loss, [Travelers] was in a position to conduct a full investigation into that loss. Indeed, [Maxus] repeatedly asked that [Travelers] do so." *Long*, 258 S.W.3d at 480. This holds true for the lost business income as well as the remediation damages, because it was readily computable under the policy. While Missouri generally does not allow prejudgment interest on lost profits, an exception exists when those lost profits are based on a predetermined contractual amount. *See Invs. Title Co. v. Chicago Title Ins. Co.*, 983 S.W.2d 533, 538-39 (Mo. Ct. App. 1998). The lost business income award here is one such predetermined contractual amount, as the policy lays out precisely how the "business interruption" expenses should be calculated. Indeed, Travelers does not dispute the formulas and methods used to determine the business interruption expense. And, contrary to the dissent's assertion, Travelers was fully aware of what it owed. Maxus provided proof of loss for its business income claim in August 2019, and Travelers knew the total amount requested since at least October 2020. Damages were liquidated.

Third, Travelers argues that the district court erred in awarding prejudgment interest because a good faith dispute existed as to whether it was liable for the remediation damages. This argument fails outright under Missouri law: "The mere fact that a party denies liability or defends a claim against him or her, or even the existence of a bona fide dispute as to the amount of the indebtedness, does not preclude recovery of interest . . . ." *Comens*, 335 S.W.3d at 82 (citation modified).

Altogether, the district court did not err in awarding prejudgment interest but erred by calculating the interest based on the invoice payment dates rather than based on the dates payments were demanded. Accordingly, we vacate the prejudgment interest award and remand for recalculation.

## III. Conclusion

For the foregoing reasons, we affirm the district court's denial of Travelers' motions for judgment as a matter of law and for a new trial as well as its grant of attorneys' fees. We vacate its grant of prejudgment interest and remand for recalculation based on further fact finding.

ARNOLD, Circuit Judge, concurring in part and dissenting in part.

I concur in the court's explanation for affirming the judgment on Maxus's water damage claim and in the court's decision to vacate the prejudgment interest award that Maxus received, but I otherwise dissent. Maxus may well have spent over fifteen million dollars cleaning the combustion byproducts that the parties generically call soot out of the first four buildings, or "phases," of the Metropolitan apartment complex. But the record does not support the jury's finding that this soot caused over fifteen million dollars in costs covered by Maxus's insurance policy with Travelers. What it reveals, instead, is less than three thousand dollars of covered soot damage to a single access control system in those phases. I would therefore reverse the district court's judgment on the Phase-One-through-Four soot damage claim except the part of it attributable to the access control system damage. I would vacate the district court's judgment on Maxus's claim that Travelers vexatiously refused to pay under the policy, which depends on the soot damage claim. And in vacating the prejudgment interest award, I would instruct the district court that prejudgment interest could not accrue on Maxus's business interruption damages because they are either speculative or entirely unproven.

Start with soot damage in Phases One through Four. Maxus's insurance policy only covered "direct physical loss of or damage to" the Metropolitan. Under Missouri law, which governs the parties' dispute, "this definition of loss requires some physicality to the loss or damage of property—e.g., a physical alteration, physical contamination, or physical destruction." *See K.C. Hopps, Ltd. v. Cincinnati*

-20-

*Ins. Co.*, 78 F.4th 1002, 1004 (8th Cir. 2023); *see also BBX Cap. Corp. v. Scottsdale Ins. Co.*, 713 S.W.3d 590, 603–04 (Mo. Ct. App. 2025).

Soot in Phases One through Four caused physical alteration or destruction of property, but it was not nearly on the order of fifteen million dollars. Some soot infiltrated and damaged the wiring of an access control system in one of those phases. That cost less than three thousand dollars to repair or replace. Neither the court nor the parties have identified evidence that soot caused uncompensated damage to Phases One through Four by physically altering or destroying any other property.

Nor is there evidence that soot damaged those phases by physically contaminating them. The court and Maxus cite nothing more than evidence that soot was present in Phases One through Four and that it can be a hazardous substance. But there is no evidence that soot actually impaired the function of Phases One through Four, much less made them "unusable or uninhabitable" as the court holds that Maxus's policy requires.

Consider the evidence the court cites that a microscopist found "moderate" or "significant" concentrations of soot in some parts of Phases One through Four. Troubling as that sounds, there is no indication that it had any effect on the usability of the phases because that was not what the microscopist was measuring. He was measuring relative to background soot concentration, not relative to safe soot concentration. So labeling a concentration moderate just meant that "something [had] come in," apart from background soot sources, that was "out of the ordinary." And labeling a concentration significant meant that there was likely "a real significant source or sources," in addition to background sources, "that [was] contributing to" the concentration. In applying these labels, the microscopist was not opining that the soot concentrations in Phases One through Four made them unusable in any degree. The only testimony on that score was another expert's opinion that there was "no evidence indicating a risk" to tenants in those phases "from fire-related residue."

-21-

That one of Maxus's consultants reported the soot accumulation in Phases One through Four to Maxus does not suggest anything to the contrary. While the consultant had an ethical duty to report hazardous conditions to Maxus, hazardous conditions are not what he reported. He testified that he notified Maxus of "the potential for" hazardous soot conditions in Phases One through Four. Assuming that he was qualified to evaluate the hazards of soot, all this report shows is that the soot in those phases could be hazardous. It was not evidence that the soot was actually hazardous, nor was it evidence that any soot hazard was severe enough to impair the function of the phases or render them unusable or uninhabitable.

The same is true of the consultant's testimony that Maxus cleaned soot from Phases One through Four in accordance with several national standards. The record does not reveal whether these were standards for remediating soot accumulations sufficient to impair the function of a building. So even if Maxus followed the standards because it needed to do so, and not out of an abundance of caution, its adherence to them does not show that soot physically contaminated those phases.

The other parts of the record that Maxus cites do not fill the evidentiary gap, and even the court does not rely on them. For the most part, Maxus piles up additional evidence that it found soot in Phases One through Four, that soot can be dangerous, and that it cleaned soot from those phases. But none of this matters because all of it is subject to the same limitation as the microscopist's measurements and the consultant's report and testimony: it says nothing about whether accumulation of soot in the phases impaired their function.

The remaining evidence Maxus cobbles together is even less relevant. Evidence that Travelers covered soot damage to Phase Five does not, despite Maxus's arguments to the contrary, make it any more likely that there was covered soot damage to Phases One through Four. The soot accumulation in Phase Five was greater than the accumulation in Phases One through Four.

And evidence that there are no health-based standards or exposure limits for soot on surfaces and no fixed numerical concentrations of soot consistently described as contamination or damage does not show that the accumulation in Phases One through Four impaired those phases' function. No one would say that eating a small number of bananas is hazardous just because there is no accepted limit for consumption of that radioactive fruit; if you are not eating hundreds of millions of bananas, the risk that the radiation will kill you is not worth mentioning. *See* Joe Schwarcz, Is It True that Bananas Are Radioactive?, Off. for Sci. & Soc'y, McGill Univ. (Mar. 15, 2018), https://perma.cc/8XC2-F8Q6. Much the same goes for soot. The absence of standards establishing when soot is hazardous, or consistently hazardous, means only that Maxus could not trot out such standards to establish that the soot in Phases One through Four was hazardous enough to make them less functional. Maxus's burden to prove that soot caused physical loss of or damage to property in Phases One through Four remained.

Since Maxus largely failed to carry that burden, I would substantially reverse the district court's judgment on Maxus's Phase-One-through-Four soot damage claim. All I would affirm in that judgment is the part that reflects the soot damage to the access control system in those phases.

Reversing almost all of the judgment on the Phase-One-through-Four soot damage claim would require the vacatur of the judgment on Maxus's vexatious refusal claim. The latter judgment included both a penalty fixed by the jury and an award of attorneys' fees fixed by the district court, and both were contingent on the judgment on the soot damage claim. So both need a fresh look to determine whether they are appropriate despite the infirmities in the soot damage judgment.

The need for another look at the penalty is apparent from the face of the jury's verdict. The jury set the penalty as a percentage of Maxus's recovery on its claims under the insurance policy, including the Phase-One-through-Four soot damage claim. *See* Mo. Rev. Stat. § 375.420. This equaled twenty percent of the first fifteen hundred dollars of the recovery, plus two percent of the rest of the recovery. But if

the jury had known that Travelers was not obliged to cover most of the Phase-One-through-Four soot damage, it likely would have adjusted the percentage. It may, in fact, have found that Travelers did not act vexatiously at all and declined to impose any penalty. The evidence the court identifies that Travelers vexatiously refused to pay a claim pertains only to Travelers's handling of the Phase-One-through-Four soot damage claim, and the same is true of nearly all the additional evidence that Maxus identifies. So the prudent course would be to vacate the current penalty and let a jury consider a new one with the understanding that Travelers was entitled to deny almost all of that claim. *Cf. Robertson Oil Co. v. Phillips Petroleum Co.*, 871 F.2d 1368, 1376 (8th Cir. 1989).

The attorneys' fees award likewise merits reconsideration. If a new jury finds that Travelers did not act vexatiously, then the award cannot stand because there is no basis for it. The authorization for the award came from the statute permitting an insured to recover attorneys' fees if its insurer vexatiously refuses to pay a claim. *See* Mo. Rev. Stat. § 375.420; *see also Dean v. Olibas*, 129 F.3d 1001, 1006 & n.5 (8th Cir. 1997). But even if it were certain that a new jury would find that Travelers behaved vexatiously, it would still be wise to remand to the district court to reevaluate the magnitude of the fees that Maxus should recover. The district court expressly relied on "the 100% successful result achieved by" Maxus at trial as support for its award. Since the evidence did not support that result, the district court might well reduce the fees it allowed if the issue came before it again. *See Chavez-Lavagnino v. Motivation Educ. Training, Inc.*, 767 F.3d 744, 753 (8th Cir. 2014).

Travelers would have us apply similar reasoning to the business interruption damages that the jury awarded to Maxus, but that would be a mistake. Though it is true that the jury's misunderstanding about coverage of Phase-One-through-Four soot damage might have affected the award, it might not have, and Travelers is responsible for the uncertainty.

The verdict form that the jury used had a single blank for the jury to fill with the total business interruption damages that Maxus would recover. Among other

things, that total was supposed to include covered business interruption damages from soot accumulation in Phases One through Four, which led Maxus to evacuate tenants, and from fire damage to Phases Five and Six, which led to repairs and reconstruction before tenants were admitted. And coverage, again, extended only to the consequences of "direct physical loss of or damage to" the Metropolitan. Maxus, recall, almost entirely failed to prove that soot caused any such loss of or damage to Phases One through Four, and it certainly proved less than what was necessary to warrant the evacuation. But recall also that the jury wrongly held Maxus liable for extensive non-business-interruption damage purportedly caused by soot in Phases One through Four. So how can we tell whether it topped up the total business interruption award with unsupported damages it attributed to the soot in those phases? There was, after all, evidence that business interruption damages attributable to the other phases could support the whole award. In a typical case, the only option would be to remand for a new trial to supply the answer. *See Friedman & Friedman, Ltd. v. Tim McCandless, Inc.*, 606 F.3d 494, 502 (8th Cir. 2010).

But in this case, there is no need to ask the question in the first place because there is a catch: Travelers proposed the single-blank verdict form. A party cannot be heard to complain when a district court gives it the verdict form it requested. Travelers created a risk of confusion when it invited the jury to aggregate different business interruption damages, and it must live with the results. *See Hoechst Celanese Corp. v. BP Chems. Ltd.*, 78 F.3d 1575, 1581 (Fed. Cir. 1996).

That brings me to the last part of the district court's judgment that is intertwined with the award of unproven Phase-One-through-Four soot damages. The district court's prejudgment interest award includes some interest accruing on those damages, which is reason enough to vacate it in part. But the court is right to vacate the award in full because it has another, broader flaw. As the court explains, the district court generally allowed interest to accrue on claimed damages before Maxus demanded that Travelers pay the damages, and Missouri law prohibits that. Under the governing Missouri statute, interest accrues "for all moneys after they become due and payable, on written contracts, and on accounts after they become due and

demand of payment is made." *See* Mo. Rev. Stat. § 408.020. It is not self-evident that sums owed under an insurance policy are "accounts" whose payment an insured must demand rather than moneys due and payable under a written contract. *See Hocker Oil Co. v. Barker-Phillips-Jackson, Inc.*, 997 S.W.2d 510, 521 n.8 (Mo. Ct. App. 1999). But our precedent teaches that "interest upon a claim against an insurer's contractual obligation runs from the date of the demand made by the insured, unless otherwise specified." *U.S. Fid. & Guar. Co. v. Empire State Bank*, 448 F.2d 360, 369 (8th Cir. 1971). Since no such specification appears in the parties' dealings here, the district court violated that principle by allowing pre-demand interest to accrue.

I part ways with the court's approach to prejudgment interest, however, to the extent that the court blesses a new prejudgment interest award calculated by merely changing the initial interest accrual date or dates. It is not just that some of the Phase-One-through-Four soot damages on which such interest would accrue lack support in the record. The court also approves an award of interest on Maxus's business interruption damages, and that award would be unduly speculative even if the damages were unrelated to the soot in the first four phases.

Under the statute that controls here, interest generally accrues on a claim only if it is liquidated, meaning that it is "fixed and determined or readily determinable." *See Macheca Transp. Co. v. Phila. Indem. Ins. Co.*, 737 F.3d 1188, 1196 (8th Cir. 2013). This protects parties who are unaware of the amount they owe. *See id.* And we have observed, in dictum, that an insurance "claim for lost business income is very similar to a claim for lost profits," *see id.* at 1197, which is unliquidated "because lost profits are inherently counterfactual, seeking damages for what might have hypothetically occurred." *See Penzel Constr. Co. v. Jackson R-2 Sch. Dist.*, 635 S.W.3d 109, 137 (Mo. Ct. App. 2021).

Whatever the limits of this analogy, it is persuasive when it comes to Maxus's business interruption claim. If the business interruption damages Maxus recovered did not reflect the lost income from evacuating Phases One through Four to clean out soot, which Travelers had no obligation to cover, then they reflected lost income

from the other phases, which Maxus had not even finished building. Projecting income from hypothetical tenants at properties still under construction is precisely the sort of assumption-heavy, counterfactual exercise that a typical lost profits claim requires and that a defendant is not expected to treat as a good estimate of what it owes. *See Bailey v. Hawthorn Bank*, 382 S.W.3d 84, 91, 107 (Mo. Ct. App. 2012). The case the court cites as authority for allowing prejudgment interest on such projected income held, in fact, that prejudgment interest could not accrue on the profits that the plaintiff anticipated but "failed to realize." *See Invs. Title Co. v. Chi. Title Ins. Co.*, 983 S.W.2d 533, 538 (Mo. Ct. App. 1998). So too here.

The rule that a plaintiff may recover prejudgment interest on contractually predetermined lost profits, if such a rule exists, does not extend to the circumstances before us. The opinion in the cited case, from which the court derives the rule, discussed predetermination only in mentioning an agreement to split a "predetermined share" of profits as a fact distinguishing *Schmidt v. Morival Farms*, a case in which the Missouri Supreme Court permitted prejudgment interest on lost profits. *See id.* at 538–39. The Missouri Supreme Court's own opinion reveals that its decision turned on the fact that the parties before it, who had agreed to share the profits of a farm in fixed percentages, had access to the income and expense figures used to calculate the profits, discussed them before interest accrued, and largely agreed on them. *See Schmidt v. Morival Farms*, 240 S.W.2d 952, 961 (Mo. 1951). Together, these precedents suggest at most that a defendant may be liable for prejudgment interest on lost profits under a contract if the contract tells the parties how to calculate the profits and the components of that calculation are facts the defendant could readily ascertain. But they do not suggest that Travelers was liable for prejudgment interest on Maxus's hypothetical estimate of its lost income. Travelers agreed to cover Maxus's business interruption losses; it did not agree to the counterfactual assumptions underlying that estimate. It had no more notice of its total liability than a buyer who repudiates a minimum purchase agreement and thus knows that it must compensate its seller for lost profits on unpurchased items but does not know the extent of the profits. And such a buyer has no obligation to pay

prejudgment interest on lost profits. *See Scullin Steel Co. v. PACCAR, Inc.*, 708 S.W.2d 756, 760, 766 (Mo. Ct. App. 1986).

That leaves one loose end: Travelers's argument that improper jury instructions tainted Maxus's recovery of non-business-interruption soot damages to Phases One through Four. After reducing those damages to the amount that Maxus sufficiently proved, that argument loses any heft it might have. The reduced damages covered the cost of repairing or replacing the soot-damaged access control system, and the challenged instructions were not responsible for Maxus's recovery of that cost. That recovery occurred because Maxus offered testimony that soot caused a quantified amount of physical damage to the access control system and Travelers did not offer contrary evidence. Even on appeal, Travelers does not seriously dispute that Maxus's policy required it to cover the quantified damage. Were the jury instructed, as Travelers insists that it should have been, that Maxus had the burden of proof, that the mere presence of soot in Phases One through Four was not covered damage, and that certain damage caused by faulty workmanship was not covered either, the jury almost certainly would have still awarded Maxus the same amount for the quantified damage to the access control system. There is no sense vacating the current award just to reach an identical outcome. *Cf. K.C. Hopps*, 78 F.4th at 1005; *Beshears v. Asbill*, 930 F.2d 1348, 1352 (8th Cir. 1991).

I would therefore affirm the award of damages for repair or replacement of the access control system, as well as the judgment on Maxus's Phase-One-through-Four water damage claim. But I would reverse the rest of the judgment on Maxus's Phase-One-through-Four soot damage claim, vacate the intertwined judgment on Maxus's vexatious refusal claim, and vacate Maxus's prejudgment interest award with instructions not to allow interest on business interruption damages.

———————————————————